775 A.2d 458

**THE CATHOLIC UNIVERSITY OF AMERICA,**

v.

**BRAGUNIER MASONRY CONTRACTORS, INC.**

No. 1009, Sept. Term, 2000.

Court of Special Appeals of Maryland.

July 3, 2001.

278

James B. Sarsfield (Hamilton and Hamilton, LLP, on the brief), Washington, DC, for appellant.

Christopher R. West (James A. Johnson and Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee.

Argued before SALMON, DEBORAH S. EYLER and THEODORE G. BLOOM (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

In a garnishment proceeding by Bragunier Masonry Contractors, Inc. ("Bragunier"), appellee, against The Catholic University of America ("The University"), appellant, the Circuit Court for Montgomery County entered judgment in favor of Bragunier and against the University for $381,136.35. The University has appealed; the questions it presents are best stated after a recitation of the pertinent facts.

## FACTS AND PROCEEDINGS[1]

In October of 1987, the University contracted with Edward M. Crough, Inc. ("Crough, Inc.") for it to serve as the general contractor for a dormitory construction project on the University's campus, in Washington, D.C. (the "North Residence

---

1. This recitation of facts is based on the factual findings made by the trial court.

Village Project"). Crough, Inc., was a Maryland corporation with its principal place of business in Rockville, Maryland.

Crough, Inc., and the University signed a written contract for the North Residence Village Project entitled "Construction Manager Agreement." Crough, Inc. subcontracted the masonry work for the North Residence Village Project to Bragunier. Bragunier performed the masonry work as required but received only 90% of the agreed price from Crough, Inc. The remaining 10% ($211,742.42) owed to Bragunier was withheld by Crough, Inc. as "retainage" and was not paid, even after the project was fully completed in 1990.

In the meantime, also in the late 1980's, some members of the University's Department of Architecture came up with an idea that led to another building project on campus. Their idea was to renovate an abandoned gymnasium and turn it into a new home for their Department. They drew up plans for what came to be known as the "Old Gymnasium Project" and presented them to Reverend William J. Byron, S.J., then President of the University.

Father Byron set about trying to raise funds for the Old Gymnasium Project. To that end, he met with Edward M. Crough, the sole stockholder and President of Crough, Inc. Mr. Crough, an alumnus of the University, had been a past benefactor. Father Byron showed Mr. Crough the plans for the Old Gymnasium Project and suggested that he make a donation to the University to fund it; in return, the University would name the newly renovated gymnasium the "Crough Center for Architecture."

After a series of meetings, Mr. Crough considered the means by which to make such a gift to the University. He and his advisors explored an outright gift of monies, a gift in trust, and a gift paid into a joint bank account. None of these vehicles was satisfactory to Mr. Crough and to the University. Eventually, Mr. Crough decided to make the donation as a gift in-kind from Crough, Inc.: the company would donate the construction materials and services for the Old Gymnasium Project and in that way "gift" the building to the University.

Mr. Crough communicated his decision to Father Byron. No writing memorializing the gift was made at that time, however.

Thereafter, on June 3, 1988, Mr. Crough and Richard M. Johnson, Vice President, on behalf of Crough, Inc., and Father Byron and Sue D. Pervi, Vice President of Administration, on behalf of the University, executed a "Construction Manager Agreement" ("CMA") for the Old Gymnasium Project. The CMA, which was similar to that used for the North Residence Village Project, was 45 pages long, with seven pages of attachments. It was divided into two parts: Part "A," "Consulting Construction Management Services Prior to Complete Construction Contracts Award," and Part "B," "Construction Management Services and Construction of General Condition Items During Project Construction." In Article 6 of Part A, the construction manager's compensation was listed as "0." In Article 16.1–16.2 of Part B, the CMA stated that upon written option by the University to authorize services under Part B and performance of the work, the total fee for the construction manager would be $300,000. In addition, on the same basis, the University would pay the construction manager, as reimbursement for "General Condition Items," a fee not to exceed $179,000. Finally, the construction manager was to be paid monthly, "upon receipt of Request For Payment," a sum equal to the cost of all separate contractors' contracts awarded and materials purchased for the construction of the Old Gymnasium Project, not to exceed $2,670,000. The total of those three figures (listed in the CMA as the "total Guaranteed Maximum Price" or "GMP") came to $3,149,000.[2]

Work on the Old Gymnasium Project got underway in 1988. Throughout the time the project was in progress, no payment requisitions were submitted to the University by Crough, Inc., and no payments were made by the University. The absence

---

2. The CMA defines "Guaranteed Maximum Price" to mean "the total not to exceed price to be paid by the Owner [the University] for the total construction cost even if the actual construction cost should exceed the Guarantee. If the construction cost should come in below the GMP the Owner shall pay the lower construction cost."

of demand and payment was as expected, given Mr. Crough's representation that he was donating the work and materials for the project to the University. Nevertheless, Crough, Inc. carried on its books, as an account receivable, $3,149,000 for the Old Gymnasium Project.

In October of 1989, the Old Gymnasium Project was timely completed by Crough, Inc. and was accepted by the University. The renovated building was named the "Crough Center for Architecture," as promised.

In late 1989, at about the time the Crough Center was finished, Mr. Crough suffered a decline in his health, and his company began to experience severe financial difficulties.[3] The financial problems most likely were caused by a severe downturn in the economy, particularly in the construction and real estate sectors.

Because of Mr. Crough's health problems, the day-to-day management of Crough, Inc. was put in Mr. Johnson's hands. When the Old Gymnasium Project had been ongoing, Mr. Johnson had prepared payment requisitions for the project and had given them to Mr. Crough to submit to the University. However, because Mr. Crough was donating the project to the University, he did not forward the requisitions. He did not tell Mr. Johnson that, though.

By February 1990, Crough, Inc. was in a dire financial crisis. On February 12, Mr. Johnson and other representatives of Crough, Inc. met with Father Byron and others from the University. Mr. Johnson told Father Byron that Crough, Inc. was experiencing serious cash flow problems and had been unable to pay a total of $1,257,000 to several of the subcontractors that had worked on the Old Gymnasium Project. Mr. Johnson then inquired as to why payments had not been forthcoming from the University on the project. Father Byron responded that the Old Gymnasium Project had been a gift from Mr. Crough, through his company, for which the

---

3. By the time this case was tried, Mr. Crough was completely incapacitated and therefore could not testify.

University owed nothing. Mr. Johnson informed Father Byron that Crough, Inc.'s financial circumstance was such that it could not afford to designate the Old Gymnasium Project as a gift; in fact, the company needed approximately $2 million dollars to pay the subcontractors on the project and meet its other cash flow obligations. Mr. Johnson asked Father Byron to have the University pay that sum.

Father Byron took Mr. Johnson's request to the Executive Committee of the University's Board of Trustees. The Executive Committee agreed to lend Crough, Inc. $1,257,000 so it could pay the money it owed to the subcontractors on the Old Gymnasium Project. It declined the request for funds beyond that sum.

On February 28, 1990, Father Byron and Mr. Crough met privately. Mr. Crough gave Father Byron a signed letter stating that "it is now and always has been my intention to pay for the total cost of the renovation of the old gymnasium as a gift to the University." Father Byron gave Mr. Crough several two-party checks, totaling $1,257,000, made out to Crough, Inc. and to each of the unpaid subcontractors on the Old Gymnasium Project. Mr. Crough agreed to repay the University that sum, over 12 years, with principal payments of $100,000 a year; to assign an interest he held in a limited partnership to the University, as collateral for the loan; and to revise his will to make a testamentary gift to the University of any balance due and owing on the principal sum at his death. Father Byron then presented Mr. Crough with a document entitled "Construction Manager Affidavit and Final Release of Claims and Lien Waiver," which Mr. Crough executed on behalf of Crough, Inc.

On September 25, 1991, Bragunier filed in the Circuit Court for Montgomery County a breach of contract action against Crough, Inc., to recover the $211,742.42 that it had failed to pay on the masonry subcontract for the North Residence Village Project. On December 12, 1991, the court granted summary judgment in favor of Bragunier and entered judg-

ment against Crough, Inc., for the sum sought, plus $5,000 in attorney's fees.

On July 31, 1992, in an effort to enforce Bragunier's judgment against Crough, Inc., Bragunier's lawyer, Richard McGrory, Esquire, contacted and spoke with Mr. Johnson. Mr. McGrory learned in the course of that conversation about Mr. Crough's in-kind gift of the Crough Center to the University, through Crough, Inc. He also learned about the Final Release of Claims and Lien Waiver that Mr. Crough had given the University, on behalf of Crough, Inc., in February 1990.

At some point in time that is not disclosed in the record, Crough, Inc. became financially non-viable to the point that it ceased operating as a business. According to the evidence, Crough, Inc. never recovered from the financial problems it began to experience in late 1989.

On November 29, 1994, in its breach of contract action against Crough, Inc., Bragunier filed a request for writ of garnishment against the University. Bragunier alleged that the University was in possession of property of Crough, Inc., including funds payable to Crough, Inc., which in turn included a "debt purportedly forgiven," in derogation of Md.Code (1975, 1997 Repl.Vol., 2000 Supp.), section 15–201 *et seq.* of the Commercial Law Article ("CL"). The request made specific reference to Md. Rule 2–645 and CL § 15–209.

Bragunier's theory in the garnishment proceeding against the University was that the CMA between the University and Crough, Inc. for the Old Gymnasium Project was a contract that obligated the University to pay Crough, Inc. $3,149,000; and that, to the extent that a part of that sum had not been paid, the University remained indebted to Crough, Inc. for that amount. Bragunier further theorized that Crough, Inc.'s February 1990 Final Release of Claims and Lien Waiver, by which it purported to forgive that debt, had constituted a fraudulent conveyance, under CL §§ 15–201 *et seq.*, because Crough, Inc. had been insolvent when it was given. Therefore, under CL § 15–209, the debt forgiveness would be disregarded, for purposes of garnishment, and the balance due

on the $3,149,000 debt remained property of Crough, Inc. in the possession of the University, and subject to attachment.

The University filed an answer to the request for writ of garnishment, asserting that it was not in possession of any property of Crough, Inc. The University also raised several defenses.[4] Bragunier filed a reply to the University's answer, but not within the time required by Md. Rules 2–231 and 2–645(e). The University moved for judgment under Md. Rule 2–645(g), which provides that, "If the garnishee files a timely answer, the matter set forth in the answer shall be treated as established for the purpose of the garnishment proceeding unless the judgment creditor files a reply contesting the answer within thirty days after its service." Bragunier opposed the motion on the ground that the University's answer had not been timely and that it knew, in any event, that Bragunier was disputing its claim not to be in possession of any assets of Crough, Inc.

The court held a hearing on the University's motion and denied it. About two years later, the University filed an amended answer to the request for writ of garnishment. Within thirty days thereafter, Bragunier filed a reply to the amended answer.

Discovery ensued between the parties. Eventually, the University filed a motion for summary judgment on the ground of limitations. Bragunier filed an opposition. The motion was heard and denied on October 13, 1999, which was the first day of trial.

The case was tried to the court for two days, after which it was continued and eventually resumed on February 24, 2000. The trial concluded the following day. Thereafter, the parties

---

4. Before then, the University had moved to dismiss for lack of personal jurisdiction and improper venue. Bragunier opposed the motion. The circuit court granted the motion, and Bragunier noted an appeal to this Court. The circuit court's ruling was reversed and the case was remanded for further proceedings. *See Bragunier v. Catholic University*, No. 566, September Term, 1995, 108 Md.App. 716 (filed February 21, 1996), slip op. at 12–15 (unpublished opinion). Thereafter, the University withdrew its personal jurisdiction defense.

submitted post-trial memoranda and proposed findings of fact and conclusions of law.

On June 1, 2000, the trial court issued a memorandum opinion and order setting forth its factual findings and the following conclusions of law (not in this order):

1. Because Bragunier's request for writ of garnishment was filed within three years of Mr. McGrory's learning, from Mr. Johnson, of the "conveyance" by Crough, Inc. to the University, the garnishment proceeding was not time-barred.

2. The CMA for the Old Gymnasium Project was a valid contract between Crough, Inc. by which the University had obligated itself to pay $3,149,000 for the project. In addition, the University was estopped to deny the existence of such a contract because by requiring Crough, Inc., through Mr. Crough, to execute the Final Release of Claims and Lien Waiver in February 1990, the University had treated the CMA as a valid contract

3. Crough, Inc.'s insolvency in February 1990 made its forgiveness of the balance due on the CMA for the Old Gymnasium Project a fraudulent conveyance, under section 15–204 of the Commercial Law Article.

4. The District of Columbia Mechanic's Lien Law did not operate to preclude Bragunier from requesting and obtaining a writ of garnishment against the University, in Maryland.

5. The University was not protected from liability by virtue of its having made all payments required by it under the North Village Residence Project CMA.

The circuit court awarded Bragunier $381,136.35 in damages, representing the $211,742.42 judgment and $169,393.93 in post-judgment interest.

The University noted a timely appeal. We have reworded and reordered the questions it presents as follows:

I. Did the circuit court err in denying its motion for summary judgment on the ground of limitations?

II. Did the circuit court err in concluding that the CMA for the Old Gymnasium Project was a valid and enforceable contract that created a debt on the part of the University that Crough, Inc. subsequently forgave?

III. Did the circuit court err in concluding that Maryland had *in rem* or *quasi in rem* jurisdiction over the garnishment proceeding when the property allegedly in the hands of the University and belonging to Crough, Inc. was real property situated out of state?

IV. Did the circuit court err in concluding that:

 1) Bragunier's failure to file a timely reply to the University's answer to the request for writ of garnishment, in which it asserted that it was not in possession of property belonging to Crough, Inc., did not establish that fact?

 2) Bragunier was entitled to proceed directly against the University to set aside the allegedly fraudulent conveyance?

 3) Bragunier's direct action against the University seeking to set aside the allegedly fraudulent conveyance was not barred by District of Columbia law?

V. Did the circuit court err in awarding post-judgment interest?

For the following reasons, we answer "Yes" to question one and reverse the judgment. We also answer "Yes" to question two. We will exercise our discretion to briefly address the jurisdictional issue raised by the University in question three. We find it unnecessary to address the remaining questions.

### STANDARD OF REVIEW

Md. Rule 8–131(c) provides:

*Action tried without a jury.* When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly

erroneous, and will give due regard to the opportunity of the trial judge to judge the credibility of the witnesses. *See also Hill v. Hill,* 118 Md.App. 36, 40, 701 A.2d 1170 (1997); *In re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997). "When the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous." *Oliver v. Hays,* 121 Md.App. 292, 306, 708 A.2d 1140 (1998) (citing *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores LLC v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750 (1997)). "The clearly erroneous standard of review ... does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact." *Seaboard Sur. Co. v. Boney,* 135 Md.App. 99, 110, 761 A.2d 985 (2000) (quoting *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990)). " 'In such cases, we must determine whether the trial court was "legally correct." ' " *Id.* (quoting *Heat & Power Corp.,* 320 Md. at 592, 578 A.2d 1202).

## DISCUSSION

 As we have explained, the judgment being appealed in this case was entered on a garnishment proceeding commenced in the breach of contract action in which Bragunier had obtained a judgment against Crough, Inc. Garnishment is a remedy created and controlled by statute. A garnishment proceeding is a form of attachment in the hands of a third party that enables the judgment creditor to enforce the judgment by obtaining property of the judgment debtor in the possession of another. *Parkville Fed. Sav. Bank v. Maryland Nat'l Bank,* 343 Md. 412, 418, 681 A.2d 521 (1996) (citing Paul v. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary,* 518 (2d ed.1992)). Once the writ of garnishment is issued and laid in the hands of the garnishee, he is bound to safely keep the assets of the debtor in his possession, together with any additional assets that come into his possession up to the time of trial. *Northwestern Nat'l Ins. Co. v. William G. Wetherall, Inc.,* 267 Md. 378, 384, 298 A.2d 1 (1972) (citing *Messall v. Suburban Trust Co.,* 244 Md. 502, 224 A.2d 419

(1966)). In that way, the writ serves to preserve the assets of the judgment debtor by creating an "inchoate lien" that is binding and prevents the garnishee from disposing of those of the assets in his possession until such time as a judgment is entered in the garnishment proceeding. *Parkville Federal Sav. Bank,* 343 Md. at 418, 681 A.2d 521 (quoting *Fico, Inc. v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430 (1980) (citations omitted)).

Garnishment is a statutory variety of subrogation. "A garnishment proceeding is, in essence, an action by the judgment debtor for the benefit of the judgment creditor which is brought against a third party, the garnishee, who holds the assets of the judgment debtor." *Fico, Inc.,* 287 Md. at 159, 411 A.2d 430 (citing *Northwestern Nat'l Ins. Co.,* 267 Md. at 384, 298 A.2d 1; *Messall,* 244 Md. at 506, 224 A.2d 419); *see also Hunt Valley Masonry, Inc. v. Fred Maier Block, Inc.,* 108 Md.App. 100, 107, 671 A.2d 47 (1996). The judgment creditor is subrogated to the rights of the judgment debtor "and can recover [against the garnishee] only by the same right and to the same extent that the judgment debtor might recover." *Fico, Inc.,* 287 Md. at 159, 411 A.2d 430 (citing *Northwestern Nat'l Ins. Co. v. William G. Wetherall, Inc.,* 272 Md. 642, 650–51, 325 A.2d 869 (1974); *Myer v. Liverpool London & Globe Ins. Co.,* 40 Md. 595, 600 (1874)); *see also Parkville Federal Sav. Bank,* 343 Md. at 418, 681 A.2d 521 (quoting *Fico, Inc.,* 287 Md. at 159, 411 A.2d 430); *Odend'hal v. Devlin,* 48 Md. 439, 445–46 (1878). For this reason, in a garnishment proceeding, the rights of the plaintiff/judgment creditor against the defendant/garnishee, cannot rise above the rights of the judgment debtor:

> The liability of the garnishee to the attaching creditor in respect of property or credits in his hands is determined ordinarily by what his accountability to the debtor would be if the debtor were in fact suing him. If by the exercise of any preexisting bona fide contract right that accountability has been removed or lessened prior to trial, the garnishee's liability to the attaching creditor is correspondingly affected. The Maryland cases have spelled out that garnishment

cannot have the effect of changing the nature of a contract between the garnishee and the debtor or of preventing the garnishee from performing an existing contract with a third person, all of which is to say the creditor is subrogated to the rights of the debtor and can recover only by the same right, and to the same extent, as could the debtor if he were suing the garnishee.

*Messall,* 244 Md. at 506–07, 224 A.2d 419 (citations omitted); *see also Peninsula Ins. Co. v. Houser,* 248 Md. 714, 717, 238 A.2d 95 (1968) (citations omitted).

 Although garnishment ordinarily will not have the effect of changing the nature of the rights between the defendant/judgment debtor and a person to whom he has transferred assets, there is an exception to that rule when there has been a fraudulent conveyance by the judgment debtor. *Chromacolour Labs, Inc. v. Snider Bros. Prop. Mgmt., Inc.,* 66 Md.App. 320, 328, 503 A.2d 1365 (1986) (citing *Odend'hal,* 48 Md. 439). Under the Maryland Uniform Fraudulent Conveyance Act, if a conveyance is fraudulent as to a creditor whose claim has matured, "the creditor, as against any person except a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or one who has derived title immediately or immediately from such a purchaser, may ... [l]evy on or garnish the property conveyed as if the conveyance were not made." CL § 15–209(a)(2).

With those principles in mind, we shall address the issues raised by the University on appeal.

# I

The University contends that the trial court erred in concluding that the garnishment proceeding in this case was not time-barred.

In denying the University's motion for summary judgment on limitations, the trial court found, as a fact, that Bragunier first learned on July 31, 1992, of the fraudulent conveyance by Crough, Inc. (to wit, its forgiveness of the debt allegedly owed to it by the University); and that its cause of action against

the University accrued on that date, under the three year limitations period of Md.Code (1973, 1998 Repl.Vol., 2000 Supp.) section 5–101 of the Courts and Judicial Proceedings Article (CJ), and the "discovery rule," as recognized by *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981). On that basis, the trial court concluded that Bragunier's November 29, 1994 filing of the request for writ of garnishment, being within three years of July 31, 1992, was timely. We disagree with the court's legal analysis of this issue.

Neither Md. Rule 2–625 nor any portion of the Maryland Code addressing garnishment or limitations of actions provides a time limit for commencing a garnishment proceeding. Because garnishment is in effect a statutory right of subrogation that permits the judgment creditor to stand in the shoes of the judgment debtor against the garnishee, the limitations period for commencing the garnishment must be derived from the underlying right of action that the judgment debtor could have brought against the garnishee. As we have explained, the judgment creditor can recover against the garnishee only to the extent that the judgment debtor could have done so; therefore, in the garnishment proceeding, the claim is subject to the same defenses, including the defense of limitations, that the garnishee could have raised against the judgment debtor in a direct action.

In the case at bar, Bragunier sought a writ of garnishment to attach a debt it claimed was owed by the University to Crough, Inc. under the June 3, 1988 CMA for the Old Gymnasium Project. Assuming that the CMA for that project was a valid contract creating such indebtedness, and further assuming that Bragunier was able to establish, under CL § 15–209, that the February 1990 Final Release of Claims and Lien Waiver ostensibly forgiving that debt was a fraudulent conveyance by Crough, Inc. to the University, so as to allow Bragunier to attach the debt in the University's hands, Bragunier's rights against the University could not exceed the right that Crough, Inc. would have had to recover the debt in a direct action against the University, and would be subject to

the same defenses. Thus, the controlling statute of limitations for purposes of the garnishment proceeding was the one that would have applied to a breach of contract action by Crough, Inc. against the University, on the CMA.

■■■ Breach of contract actions are governed by the general statute of limitations set forth in CJ § 5–101 for actions at law. That statute provides that suit "shall be filed within three years from the date [the cause of action] accrues...." Ordinarily, a cause of action for breach of contract accrues when the contract is breached, or is anticipatorily breached. *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 79 Md.App. 461, 473, 558 A.2d 419 (1989) (citing *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 171, 527 A.2d 1316 (1987); *Yingling v. Phillips*, 65 Md.App. 451, 460, 501 A.2d 87 (1985)).

■■■ In this case, by October 1989, all work on the Old Gymnasium Project had been fully performed and the completed Crough Center had been turned over to and accepted by the University. Accordingly, that date was the latest possible accrual time for any breach of contract action for non-payment that could have been brought by Crough, Inc. against the University; and limitations on that cause of action would have expired three years later, in October 1992. Had such an action been filed by Crough, Inc. against the University in November 1994, the University could have raised limitations as a defense, so as to bar the remedy. *See Shipley v. Meadowbrook Club*, 211 Md. 142, 152, 126 A.2d 288 (1956) (noting that the statute of limitations does not extinguish debt but bars the remedy) (citations omitted)).

In the garnishment proceeding, as the subrogee to the rights of Crough, Inc. against the University, Bragunier was subject to the same limitations defense that the University could have raised had it been sued by Crough, Inc. By the time Bragunier filed its request for writ of garnishment of the debt to Crough, Inc., allegedly in the hands of the University, in November 1994, the three year limitations period on any breach of contract action for non-payment that Crough, Inc.

could have brought against the University had expired. Accordingly, Bragunier's request for writ of garnishment was not timely.

Ordinarily, in a breach of contract action, in the absence of fraud concealing the cause of action, for which there is a separate limitations provision, *see* § CJ 5–203, the cause of action accrues and hence limitations begins to run from the date of the breach and not from the date that the plaintiff discovers the defendant's breach. *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 714–15, 255 A.2d 359 (1969) (citing *Killen v. George Washington Cemetery,* 231 Md. 337, 343, 190 A.2d 247 (1963)). In other words, the discovery rule recognized by the Court of Appeals in *Poffenberger v. Risser, supra,* while applicable to many causes of actions in tort, does not apply to actions for breach of contract. For that reason, in determining whether the garnishment proceeding was timely, the date that Bragunier learned of the CMA for the Old Gymnasium Project was irrelevant. The discovery rule was not applicable to the garnishment proceeding because it would not have had any application to the breach of contract action for non-payment that Crough, Inc. could have brought against the University. Moreover, the date on which Bragunier learned of the allegedly fraudulent conveyance by which Crough, Inc. forgave any debt owed it by the University likewise was of no significance to the timeliness of the garnishment proceeding. There was no allegation in this case that that transaction or any other conduct on the part of Crough, Inc. kept Bragunier (or anyone else) in the dark about the University's alleged debt to Crough, Inc.

In the garnishment proceeding, the University was entitled to, and did, raise the same limitations defense that it could have raised had Crough, Inc. sued it directly. The undisputed facts established that to the extent there was any obligation on the part of the University to pay Crough, Inc. the balance of the GMP stated in the CMA for the Old Gymnasium Project, that obligation was breached no later than October 1989. Crough, Inc. would have had three years from then to file a

breach of contract action to recover whatever sums were owing under that contract. Accordingly, just as Crough, Inc.'s contract action would have been time-barred, the garnishment proceeding against the University was time-barred. The trial court erred as a matter of law in concluding otherwise.

## II

We shall discuss the issue raised by the University in question two because, in our view, it is an alternative basis for reversal. We point out, however, that if we were to have reversed the judgment on this issue alone, we would have remanded the case for further proceedings.

With one exception, the University does not challenge the factual findings of the circuit court respecting the CMA for the Old Gymnasium Project and the events that culminated on February 20, 1990 with, *inter alia,* the University paying the subcontractors on that project.[5] It contends, however, that the trial court's factual findings did not and could not support its legal conclusion that the CMA for the Old Gymnasium Project constituted a contract obligating it to pay Crough, Inc. for that project. Rather, it argues that the factual findings of the trial court compelled the legal conclusion that no such contract came into existence. Thus, because the University never was indebted to Crough, Inc., it never was in possession of property of Crough, Inc. subject to garnishment (irrespective of the impact of the February 20, 1990 release).

The facts in evidence, and the facts found by the trial court, established that Mr. Crough intended to donate the Old Gymnasium Project to the University as a gift; and that, after looking into and rejecting several vehicles for making that gift, he settled on making a gift in-kind, through his wholly owned company. The evidence also established that the University sought Mr. Crough's involvement with the Old Gymnasium Project because he previously had donated substantial sums to

---

5. The University does contest the trial court's factual finding that Crough, Inc. was insolvent in February 1990. That does not have a bearing on our analysis of this issue, however.

it, and it was seeking for him to do so again. Indeed, as an incentive, the University proposed that the completed building be named after Mr. Crough.

Having made those findings, the question before the trial court was whether the CMA was a new agreement between the parties that replaced the previous understanding with a contract requiring payment or whether the CMA did not supplant the parties' agreement that the project was a donation, but merely served some other purpose.[6] The trial court concluded that the CMA for the Old Gymnasium Project was a valid contract as a matter of law because 1) it was a writing purporting to set forth the rights and obligations of the parties and, under the parol evidence rule, extrinsic evidence could not be used to show that it was a "front," *i.e.*, that it was merely a document evidencing a gift; and 2) the University's conduct in February 1990 estopped it to deny that the CMA was a contract obligating payment on its part.

 The trial court did not properly apply the parol evidence rule in this case. In fact, that rule had no application to the issue before it. The parol evidence rule precludes the admission of extrinsic evidence to vary or contradict the terms of an integrated written contract. *Calomiris v. Woods,* 353 Md. 425, 432, 727 A.2d 358 (1999) (citing Restatement (Second) of Contracts § 213 (1979)). Notwithstanding that a writing appears to be a complete integration of the terms of an agreement between the parties, "parol evidence" is admissible to prove that the writing was executed for another reason altogether, and therefore lacked legal effect. Indeed, in that circumstance, the evidence in question is not "parol evidence." It is not being offered to vary the terms of an integrated writing. Rather, it is being offered to show that the writing does not constitute a contract at all. Recently, in *Tricat Indus. v. Harper,* 131 Md.App. 89, 108, 748 A.2d 48 (citations

---

**6.** Father Byron testified that he thought the CMA served the purpose of documenting the value of Crough, Inc.'s gift for tax purposes.

omitted), *cert. denied,* 359 Md. 334, 753 A.2d 1032 (2000), we explained this principle:

> The parol written evidence rule only applies ... when there is a binding contract.... Parol evidence is admissible, therefore, to show that a writing never became effective as a contract or that it was void or voidable.
>
> * * * * *
>
> Parol evidence is admissible to show that a particular written paper was never intended as a contract or as the binding record of a contract between the parties.... The parol evidence rule has no application unless the paper is presented as the contract.

 Although it is not necessary to the formation of a contract that the parties consciously intend to affect their legal relations, particularly when their actions are such as usually would create a contractual obligation, when the parties have expressed the intention *not* to affect their legal relations, a contract will not have been formed. As the author of one treatise has explained:

> [B]usiness agreements that under ordinary circumstances would be regarded as enforceable contracts are sometimes prevented from being enforceable if the parties expressly declare that they do not intend to affect their legal relations and are depending solely upon the sanctions of honor and morality.
>
> It is not necessary that the parties should consciously advert to legal relations in order to make an enforceable contract, but it is important whether they express an intention to exclude legal relations.

I. Arthur Corbin, *Corbin on Contracts,* § 2.13 at 188–89 (Joseph M. Perillo ed.1993) (footnotes omitted). When in a contract action on a writing that the plaintiff claims is a contract the defendant contests the formation of a contract, taking the position that the writing served some other purpose and was not meant by the parties to be a contract, "parol evidence" is admissible on that issue.

*Gordy v. Ocean Park, Inc.*, 218 Md. 52, 145 A.2d 273 (1958), is an example of such a case. There, a real estate broker sued the owner of a parcel of real property for a commission allegedly earned on a contract of sale for the property. The defendant took the position that the writing that the plaintiff claimed was the contract on which the commission had been earned was not a contract at all. The plaintiff requested a ruling from the trial court that the writing constituted a contract, as a matter of law. The trial court refused, and submitted that question to the jury, which decided adversely to the plaintiff. The Court of Appeals affirmed, explaining:

> That, as a general rule, the construction or interpretation of all written instruments is a question of law for the court is a principle of law that does not admit of doubt.... However before the court can construe a contract, there must exist a contract; and, if it be claimed that an instrument of writing, although in form a complete agreement, was not intended by the parties to be binding upon them, the question as to whether or not the instrument was so intended is one for the jury.

*Id.* at 60, 145 A.2d 273 (citations omitted); *see also Colonial Park Estates v. Massart*, 112 Md. 648, 655, 77 A. 275 (1910) ("Although parol evidence is inadmissible to vary or contradict the terms of a written agreement, it is well settled that such evidence is admissible to show that a particular written paper 'was never intended as a contract [nor] as the binding record of a contract between the parties.' " (quoting *Southern Street Ry. Adver. Co. of Baltimore v. Metropole Shoe Mfg. Co. of Baltimore*, 91 Md. 61, 67, 46 A. 513 (1900))).

Courts in other jurisdictions recognize the well-established rule that evidence of surrounding circumstances is admissible on the question of whether a contract was made, in the face of evidence of a writing claimed to be a contract. In *Nice Ball Bearing Co. v. Bearing Jobbers, Inc.*, 205 F.2d 841 (7th Cir.1953), for example, the parties had entered into a written instrument in the form of a contract for the sale of stock. The appellate court held that evidence of discussions by the parties properly was admitted to show that the writing was intended

by them only as a sham and not as an operative contract. No contract was formed because the parties did not intend to enter into a contract, notwithstanding their writing, and expressed that intent to each other. The evidence of the parties' interactions when the writing was signed was not inadmissible parol evidence; it was admissible evidence on the issue of mutual assent/contract formation. *See also Porreca v. Gaglione,* 358 Mass. 365, 265 N.E.2d 348, 350 (1970) (affirming the admission of "parol evidence" to prove that a trust instrument was a sham); *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.,* 96 Wash.2d 939, 640 P.2d 1051, 1055 (1982) (noting that, under the normal rules of contract interpretation, extraneous evidence is admissible to show that the "mutual intention of the parties was not to enter into an enforceable contract, and that a writing was never operative" as a contract) (citations omitted).

A case bearing some similarity to this one is *Taylor v. Allegretto,* 112 N.M. 410, 816 P.2d 479 (1991). There, a construction contractor and a property owner executed a standard American Institute of Architects ("AIA") Abbreviated Form Agreement. The contractor maintained that the parties did so only in order to obtain financing for the project, and that certain oral contracts between the parties that predated the written AIA contract in fact governed their legal relationship. The trial court refused to admit the contractors' proffered evidence of the oral contracts, on the ground that it would violate the parol evidence rule. The appellate court reversed, holding that the evidence was admissible and had to be considered by the fact finder in deciding when a contract between the parties was formed.

 In the case *sub judice,* the trial court ruled that because the CMA had all the formalities and the appearance of an integrated contract, it could not consider parol evidence to vary its terms. The court wrote:

> The existence of a document which delineates the rights and responsibilities of [the University] and Crough, Inc., coupled with the formal execution of the document by the appropri-

ate parties, negates [the University's] contention that such an agreement did not in fact exist. The Court of Appeals has recognized that "[a] contract is 'a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Doe v. Doe,* 122 Md.App. 295, [360], 712 A.2d 132 (1998), *rev'd on other grounds,* 358 Md. 113, 747 A.2d 617 (2000)(quoting Richard A. Lord, 1 *Winston on Contracts* [sic] § 1:1, at 2–3 (4th ed.1990)). Upholding [the University's] request of this Court to set aside the legal import of the agreement would require the Court to ignore established principles of contractual law recognizing the components of a valid contract. *See Calomiris v. Woods,* 353 Md. 425, 727 A.2d 358 (1999) (providing that when the language of a contract is clear and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed).

Again, we disagree.

The question here was not one of construing the writing offered by Bragunier as a contract between Crough, Inc. and the University. The question was whether, notwithstanding the appearance of the writing and its formalities, the parties to it had declared an intention that it not constitute a contract requiring payment by the University to Crough, Inc. for the construction of the Crough Center. The fact that the writing had the appearance and formalities of a contract did not negate the University's claim that no contract was formed. The court was required to take into account and assess all of the evidence of the surrounding circumstances to answer that question. Clearly, it did not do so. Indeed, many of the court's findings seem to assume that the parties to the CMA continued in their original understanding that the Old Gymnasium Project was being made a gift from Crough, Inc. to the University, notwithstanding their having executed the CMA, which is inconsistent with the court's ultimate conclusion that the CMA constituted a contract requiring payment to Crough, Inc. by the University, and would support the contrary conclusion that no contract was formed.

■ The trial court also concluded that the University's act, in February 1990, of presenting Mr. Crough with the Final Release of Claims and Lien Waiver, estopped it to deny the existence of the CMA as a binding contract imposing an obligation by Crough, Inc., to pay. We disagree with the trial court's application of the doctrine of equitable estoppel to this case.

■ Under the doctrine of equitable estoppel, a party will be precluded by his voluntary conduct from asserting, at law or in equity, either property, contract, or remedial rights that otherwise might have existed as against a person who relied on such conduct in good faith and thereby was led to change his condition for the worse, and in doing so acquired some corresponding right, either of property, contract, or of remedy. *Savonis v. Burke*, 241 Md. 316, 319, 216 A.2d 521 (1966) (quoting 3 Pomeroy *Equity Jurisprudence* § 804, at 189 (5th ed.) and citing *Bayshore Indus. v. Ziats*, 232 Md. 167, 175, 192 A.2d 487 (1963); *Webb v. Johnson*, 195 Md. 587, 595, 74 A.2d 7 (1950); *Crane Co. v. Onley*, 194 Md. 43, 50, 69 A.2d 903 (1949) (citations omitted)); *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 631, 726 A.2d 818 (1999) (quoting *Knill v. Knill*, 306 Md. 527, 534, 510 A.2d 546 (1986) (citations omitted)). The essential elements of estoppel are "(1) voluntary conduct or a representation by the party to be estopped, even if there is no intent to mislead; (2) reliance by the estopping party; (3) and detriment to the estopping party." *Fiola Blum*, 125 Md.App. at 631, 726 A.2d 818 (citing *Grimberg v. Marth*, 338 Md. 546, 555–56, 659 A.2d 1287 (1995); *Knill*, 306 Md. at 535, 510 A.2d 546; *Lampton v. LaHood*, 94 Md.App. 461, 475–76, 617 A.2d 1142 (1993)). The doctrine of estoppel is not applicable if the party raising it was not misled to his or her detriment. *DeBusk v. Johns Hopkins Hosp.*, 105 Md.App. 96, 104, 658 A.2d 1147 (1995), *aff'd*, 342 Md. 432, 677 A.2d 73 (1996).

■ In Maryland, the doctrine of equitable estoppel can be used as a defense to a claim or to avoid a defense, but not as a basis for an affirmative cause of action. *Cogan v.*

*Harford Mem'l Hosp.,* 843 F.Supp., 1013, 1021 (D.Md.1994) (citing *Sav–A–Stop Servs., Inc. v. Leonard,* 44 Md.App. 594, 410 A.2d 603 (1980), *aff'd,* 289 Md. 204, 424 A.2d 336 (1981)). While the doctrine of equitable estoppel operates to prevent a party from asserting his rights when, due to his conduct, permitting him to do so would be contrary to equity, the doctrine does not give rise to any affirmative duties and is not a means to recognize a preexisting legal right. *Biser v. Town of Bel Air,* 991 F.2d 100 (4th Cir.1993) (citations omitted) (applying Maryland law); *Sav–A–Stop Servs., Inc.* 44 Md.App. at 601, 410 A.2d 603.

 The doctrine of equitable estoppel did not apply to this case for several reasons. First, it may not be used as a substitute for affirmative proof of the existence of a contract. It was essential to Bragunier's garnishment request that it prove that the University had in hand monies owed to Crough, Inc., on the CMA for the Old Gymnasium Project, which in turn required it to prove the existence of that contract. Bragunier could not affirmatively prove the existence of the contract by preventing the University from contesting it on the basis of the University's actions in presenting a release to Crough, Inc. in February 1990. (To like extent, Crough, Inc. could not have established the existence of a contract for payment between it and the University in that fashion.)

Second, the conduct and statements of the University on which the claim of estoppel was based were not misleading, either to Crough, Inc., to whom they were directed, through Mr. Crough, and in whose shoes Bragunier was standing, or to anyone else. Finally, to the extent that Crough, Inc. acted to its detriment by having Mr. Crough sign the Final Release of Claims and Lien Waiver, it did so with full knowledge of the surrounding circumstances and, according to the University, because doing so was consistent with the original understanding of the parties that the University was not to become obligated, directly or indirectly, for any sums in connection with construction of the project.

In considering whether the CMA for the Old Gymnasium Project was a contract obligating the University to pay Crough, Inc. for that project, the trial court could and should have considered all of the surrounding circumstances, including the conduct of the parties before, during, and after the writing was signed, and drawn inferences based on the parties' conduct as to whether they intended for the CMA to create a binding obligation to pay. The doctrine of equitable estoppel could not operate to establish the existence of such a contract, however.

The trial court's conclusion that the CMA for the Old Gymnasium Project was a contract obligating the University to pay Crough, Inc. was premised on legally incorrect applications of the parol evidence rule and the doctrine of equitable estoppel. As we have explained, ordinarily, we would reverse the judgment on this ground and remand the case to the circuit court for further proceedings. We shall not do so because we already have determined that the garnishment proceeding was not timely, as a matter of law.

## III

The University challenges subject matter jurisdiction in this case. It maintains that the circuit court was without jurisdiction because the property of Crough, Inc., allegedly in the University's hands, was real estate located outside of the State of Maryland.

A garnishment proceeding though commenced *in rem* or *quasi in rem* may result in the entry of a judgment *in personam* against the garnishee. *See* Md. Rule 2–645(j). "Nevertheless, since fundamentally [garnishment proceedings] seek to compel the appearance of the defendant by seizure of the *res*, the Court issuing the attachment must have jurisdiction over the *res*. ... If it is an intangible, such as a debt owed by the garnishee, the debt must either be payable expressly in this State or jurisdiction must be had over the debtor," as the custodian of the debt. *Cole v. Randall Park*

*Holding Co.*, 201 Md. 616, 628, 95 A.2d 273 (1953) (citations omitted).

In the case at bar, the *res* was the debt allegedly owed by the University to Crough, Inc. The *res* was not the Crough Center, as the University seems to assume. Because the alleged debt would have been payable to Crough, Inc., in Maryland, the court had jurisdiction over the *res*. Accordingly, notwithstanding that the debt allegedly owed by the University to Crough, Inc., was incurred for the construction of a building on real estate located outside of Maryland, there was subject matter jurisdiction in this case.

**JUDGMENT REVERSED. COSTS TO BE PAID BY THE APPELLEE.**