679 A.2d 1087

**Jane DOE et al.**

v.

**A. Joseph MASKELL et al.**

**No. 102, Sept. Term, 1995.**

Court of Appeals of Maryland.

July 29, 1996.

Reconsideration Denied Aug. 23, 1996.

Phillip G. Dantes (Beverly A. Wallace, Bregel, Kerr, Davis & Dantes), James G. Maggio (Maggio & Wyman, all on brief), Towson, for Petitioners.

Kevin M. Murphy (Matthew Cuccias, on brief), Washington, DC, J. Michael Lehane, Shirlie Norris Lake (Mark Anthony

Kozlowski, on brief), Baltimore, Andrew Janquitto (Mudd, Harrison & Burch, on brief), Towson, for Respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

In this case we are asked to decide whether the "discovery rule" applicable to the time-bar of the statute of limitations on civil actions at law found in Maryland Code (1974, 1995 Repl. Vol.), § 5–101 of the Courts & Judicial Proceedings Article,[1] applies to cases of allegedly "repressed" and "recovered" memories. We hold that repression of memories is an insufficient trigger to compel the application of our discovery rule, and we shall affirm the summary judgment entered in favor of the defendants.

I

Reviewing the record in a light most favorable to the plaintiffs, the facts of the case are as follows: Jane Doe, from 1967 to 1971, and Jane Roe, from 1968 to 1972, were students at Seton Keough High School [hereinafter "Keough"], a parochial school in Baltimore City. During their tenure at Keough, both girls, individually were referred for counseling to the school chaplain, Father A. Joseph Maskell. According to the complaints filed in the cases, Maskell subjected the girls to repeated sexual, physical, and psychological abuse including:

> "vaginal intercourse, anal intercourse, cunnilingus, fellatio, vaginal penetration with a vibrator, administration of enemas, ... hypnosis, threats of physical violence, coerced prostitution and other lewd acts, physically striking Plaintiff, and forcing Plaintiff to perform sexual acts with a police

---

**1.** Hereinafter, unless otherwise indicated, all statutory references are to Md.Code (1974, 1995 Repl.Vol.) of the Courts & Judicial Proceedings Article.

officer." [2]

■ Both girls were allegedly threatened with extreme punishments if they informed anyone of the abuse, which continued until the girls graduated and left Keough in 1971 and 1972 respectively. At some point,[3] both plaintiffs claim

---

**2.** This list contains the alleged acts of physical and sexual abuse common to both plaintiffs. As to Doe, she testified that the defendant placed a gun in her mouth. As to Roe, she testified that Defendant also administered douches and conducted pelvic examinations.

**3.** It is unclear from the record the precise moment at which the plaintiffs ceased to recall the attacks. Repression theory accommodates at least two models: "serial repression" and "collective repression." As one pair of commentators explain:

"In accordance with this robust repression concept, a person could, for example, banish awareness of the experience of having been brutally raped one or a hundred times during childhood. These distressing memories might be repressed serially, immediately following each event. Alternatively, all the memories might be collectively repressed at some time later, after the abuse stopped. If the memory of rapes were serially repressed, a child could go from rape to rape ignorant of the previous assault. If memories were collectively repressed, a child could have retained awareness of the rapes throughout the years they were happening and repressed them as a group at some later moment."

Richard Ofshe & Ethan Watters, *Making Monsters*, 30 Soc'y 4, 5 (March/April 1993). Because we are evaluating the grant of summary judgment, all factual inferences must be resolved in the non-moving party's favor. Thus we must accept that the repression occurred in a serial fashion.

We note, however, that these plaintiffs have failed to offer substantial proof of when the repression, be it "serial" or "collective," occurred. If the repression occurred before the plaintiffs attained majority, the statute of limitations could not begin to run until the plaintiffs reached majority, and depending on our decision in this case, the discovery rule could potentially operate to toll the statute of limitations. Limitations would not begin to run until the repression ended and the resurfacing memories put the plaintiffs on sufficient notice.

Alternatively, however, if the repression happened in a "collective" fashion, after the plaintiffs achieved majority, and the plaintiffs were under no other disability, the statute of limitations immediately begins to run. Under traditional Maryland law, once the statute of limitations begins to run against a plaintiff, ordinarily no subsequent event will arrest it. *Hogan v. Stumper*, 257 Md. 520, 521, 263 A.2d 571, 572 (1970); *Maurice v. Worden*, 52 Md. 283 (1879); *Fink v. Zepp*, 76 Md. 182, 185, 24 A. 538, 539 (1892); *Dugan v. Gittings*, 3 Gill 138, 160–61 (1845) ("If subsequent disabilities were to be regarded, the right of action might be saved for centuries; and the statute would be rendered

that they ceased to recall the abuse suffered at the hands of Father Maskell, due to a process they term "repression." [4] Both plaintiffs began to "recover" memories of this abuse in 1992.

Plaintiffs filed suit against Father A. Joseph Maskell, Christian Richter M.D.,[5] the School Sisters of Notre Dame, Seton Keough High School, the Archdiocese of Baltimore, and Archbishop William Keeler in his capacity as Archbishop of Baltimore. The suits, filed in the Circuit Court for Baltimore City on August 24, 1994 allege battery, negligent supervision, negligent misrepresentation, intentional infliction of emotional distress, fraud, and loss of consortium.[6] The cases were consolidated for trial and assigned to the Honorable Hilary D. Caplan for trial. Prior to trial, the trial judge conducted a hearing to consider defendants' motions for summary judgment based on the time-bar of the statute of limitations.

At the hearing, both plaintiffs testified, as did expert witnesses offered by both plaintiffs and the defendants. Affidavits, interrogatory answers and deposition transcripts were also part of the record. At the conclusion of the hearing, Judge Caplan entered summary judgment for the defendants. Doe and Roe appealed to the Court of Special Appeals. Before the case was considered by the intermediate appellate

---

incapable of accomplishing the important purposes for which it was passed."). Therefore, if Doe or Roe had not yet repressed the memories of the sexual assault by the defendants by even the day after their attaining majority, the statute of limitations barred these claims three years after their eighteenth birthdays, for Doe after August 11, 1974, and for Roe, after April 29, 1975.

**4.** Jane Roe testified that she at all times retained memory of some of the abusive acts, including requiring her to disrobe in his office, caressing her while naked, forcing her to administer douches, and slapping her face. She claims, however, to have repressed her memories of more severe abuse, including multiple rapes.

**5.** Dr. Richter is a defendant only in the suit brought by Jane Roe, not Jane Doe.

**6.** The loss of consortium count applies only to the suit of Jane Doe, and her husband, John Doe, not to the Jane Roe suit.

court, plaintiffs petitioned this Court for certiorari. The defendants agreed that the petition should be granted, and we issued our writ of certiorari to consider the important issues raised by this case.

## II

The general Maryland statute of limitations and the one applicable in this case is Md.Code (1974, 1995 Repl. Vol.), § 5–101 of the Courts and Judicial Proceedings Article. That section provides:

> "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

■ Statutes of limitations, like the one contained in § 5–101, are intended simultaneously to "provide adequate time for diligent plaintiffs to file suit," *Pennwalt Corp. v. Nasios,* 314 Md. 433, 437, 550 A.2d 1155, 1158 (1988), to "grant repose to defendants when plaintiffs have tarried for an unreasonable period of time," *id.* at 437–38, 550 A.2d at 1158, and to "serve societal purposes," *id.* at 438, 550 A.2d at 1158, including judicial economy. There is no magic to a three-year limit. It simply represents the legislature's judgment about the reasonable time needed to institute suit. We have also observed that:

> "Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients rather than principles."

*Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 664–65, 464 A.2d 1020, 1025 (1983) (*quoting Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945)).

Historically, our cases have held that a cause of action "accrued" on the date of the wrong. *Hahn v. Claybrook,* 130 Md. 179, 182, 100 A. 83 (1917). Under this "date of wrong" rule, claims that were not discovered until after the limitations period had expired were automatically barred. This tradition-

al rule did not distinguish between a "blamelessly ignorant" plaintiff and one who had acted negligently and "slumbered on his rights." *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 334, 635 A.2d 394, 399 (1994) *(citing Harig v. Johns–Manville Products*, 284 Md. 70, 83, 394 A.2d 299, 306 (1978).

■ To ameliorate this harsh result, this Court[7] developed the "discovery rule," which holds that a cause of action "accrues" when plaintiff knew or should have known that actionable harm has been done to him. This discovery rule initially arose in the context of medical malpractice, *see Hahn v. Claybrook*, 130 Md. 179, 100 A. 83 (1917), but soon expanded to encompass other forms of professional malpractice. *See, e.g., Leonhart v. Atkinson*, 265 Md. 219, 289 A.2d 1 (1972) (accountant); *Steelworkers Holding v. Menefee*, 255 Md. 440, 258 A.2d 177 (1969) (architect); *Mattingly v. Hopkins*, 254 Md. 88, 253 A.2d 904 (1969) (civil engineer); *Mumford v. Staton, Whaley & Price*, 254 Md. 697, 255 A.2d 359 (1969) (attorney).

These developments culminated in *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), where we made the discovery rule applicable in all civil suits. We held that in order to

"activate the running of limitations [it must be proven that the plaintiff had] actual knowledge—that is express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' "

*Poffenberger*, 290 Md. at 637, 431 A.2d at 681 (quoting *Fertitta v. Bay Shore Dev. Corp.*, 252 Md. 393, 402, 250 A.2d 69, 75 (1969)).

---

7. It has been suggested that the Court of Appeals of Maryland was the first in the nation to adopt the discovery rule. Note, *The Statute of Limitations in Actions for Undiscovered Malpractice*, 12 Wyo.L.J. 30, 34 (1957).

But the discovery rule, by necessity, must operate different- ly in different contexts. To retain the requisite flexibility to apply the rule to different situations, this Court has always retained to itself the power to shape the contours of the discovery rule. As we explained in *O'Hara v. Kovens*, 305 Md. 280, 503 A.2d 1313 (1986), "how the discovery rule oper- ates in different types of cases is for the court to determine." *Id.* at 298, 503 A.2d at 1322. *See also Hecht v. Resolution Trust Corp.*, 333 Md. 324, 635 A.2d 394 (1994) (in a suit by corporation against its officers and directors alleging reckless banking practices, doctrine of adverse domination tolls the statute of limitations); *Trimper v. Porter–Hayden*, 305 Md. 31, 501 A.2d 446 (1985) (latent disease actions accrue at the earlier of discovery or death); *Pennwalt Corp. v. Nasios*, 314 Md. 433, 452, 550 A.2d 1155, 1165 (1988) ("discovery rule in a product liability action requires that statute of limitations should not begin to run until the plaintiff knows or . . . should know of injury, its probable cause and either manufacturer wrongdoing or product defect."). It is, therefore, for the trial court initially, and ultimately for this Court, to determine how the discovery rule will be applied to cases involving repressed memories. In so doing, we are mindful that "in determining the application of the statute [of limitations] to particular actions, we do so with awareness of the policy considerations unique to each situation." *Hecht*, 333 Md. 324, 338, 635 A.2d 394, 401 (1994). Therefore, the determination of the applica- bility of the discovery rule in a memory loss or repression case is a legal determination for this Court to make.[8]

### III

We find that the critical question to the determination of the applicability of the discovery rule to lost memory cases is whether there is a difference between forgetting and repres-

---

**8.** This legal review fortuitously coincides with our standard of review of the grant of summary judgment, "whether the trial court was legally correct." *Heat & Power v. Air Products*, 320 Md. 584, 591, 578 A.2d 1202, 1206 (1990).

sion. It is crystal clear that in a suit in which a plaintiff "forgot" and later "remembered" the existence of a cause of action beyond the 3-year limitations period, that suit would be time-barred. Dismissal of such a case reflects our judgment that the potential plaintiff had "slumbered on his rights," should have known of his cause of action, and was blameworthy. To permit a forgetful plaintiff to maintain an action would vitiate the statute of limitations and deny repose for all defendants.

Plaintiffs in this case, however, claim that in order to avoid the pain associated with recalling the abuse they suffered, their memories were "repressed," not merely "forgotten," and later "recovered," rather than "remembered." They argue that this difference renders them "blamelessly ignorant" and excuses their failure to file suit in a timely manner. To aid in an understanding of plaintiffs' argument, we have extracted two implicit assumptions:

1. That there is a qualitative and quantitative difference between "repression" and mere "forgetting;" and

2. that this difference is of a sufficient quality to compel us to find that plaintiff is excused by operation of the discovery rule and had no reason to have known about the existence of her cause of action.

We have reviewed the expert testimony provided at the summary judgment hearing, and reviewed numerous scientific journals submitted by the parties. We begin by attempting to understand what repression is. Even defining the term is not easy; it originated with Sigmund Freud who used the term differently and sometimes contradictorily throughout his career. David S. Holmes, *The Evidence for Repression: An Examination of Sixty Years of Research, in* REPRESSION AND DISASSOCIATION: IMPLICATIONS FOR PERSONALITY, THEORY, PSYCHOPATHOLOGY AND HEALTH 85, 85–86 (J. Singer, ed. 1990) [hereinafter *"The Evidence for Repression"*]. Holmes chooses to adopt a definition of repression based on the manner in which the term is conventionally used:

"It is my belief that in its general use the concept of repression has three elements: (1) repression is the selective forgetting of materials that cause the individual pain; (2) repression is not under voluntary control; and (3) repressed material is not lost but instead stored in the unconscious and can be returned to consciousness if the anxiety that is associated with the memory is removed. The assertion that repression is not under voluntary control differentiates repression from suppression and denial, with which it is sometimes confused...."

*The Evidence for Repression* at 86.

The plaintiffs have provided us with several studies purporting to validate the diagnosis of repression. J. Briere & J. Conte, *Self–Reported Amnesia for Abuse in Adults Molested as Children,* 6 J. TRAUMATIC STRESS 21 (1993); J.L. Herman & E. Schatzow, *Recovery and Verification of Memories of Childhood Sexual Trauma,* 4 PSYCHOANALYTIC PSYCHIATRY 1 (1987); Elizabeth F. Loftus, et. al., *Memories of Childhood Sexual Abuse, Remembering and Repressing,* 18 PSYCHOL. WOMEN Q. 67 (1994); Linda M. Williams, *Adult Memories of Child Sexual Abuse: Preliminary Findings from a Longitudinal Study,* 5 AM SOC'Y PREVENTION CHILD ABUSE ADVISOR 19 (1992).

The Defendants have also offered significant scientific information tending to discredit the concept of repression and its application in this setting. These arguments against repression take several forms.

First, the adversaries of repression stress that there is no empirical, scientific evidence to support the claims that repression exists. The studies purporting to validate repression theory are justly criticized as unscientific, unrepresentative, and biased. *See e.g.* Harrison G. Pope, Jr. & James I. Hudson, *Can memories of childhood sexual abuse be repressed?,* 25 PSYCHOL. MED. 121 (1995); *The Evidence for Repression* at 96–99. The reason for the failure of repression enthusiasts to obtain empirical evidence may be the nature of the process itself. As Dr. Jason Brandt of the Johns Hopkins University School of Medicine testified:

"There are clear cases of people who claim that they don't remember things that happened in their past for whom no neurologic cause can be found. They don't have brain damage. They have nothing organically wrong that can account for [the claimed memory loss]. The question whether they remember or not, whether they truly have the mental state of a memory or not is impossible to determine."

"We know what they are reporting, we don't know what they are experiencing. Furthermore, I believe that it is virtually impossible to distinguish psychogenic amnesia from faking, from malingering since the distinction between the two hinges on how conscious it is to the person and how willful it is, how intentional it is. And how conscious somebody is and how willful they're being, are things that in spite of what we may say, we really don't have any way of assessing."

Just because there is so far no empirical validation for the theory of repression is not alone sufficient reason to discount the concept, yet it does cast some doubt.

Second, critics of repression theory point out that the scientific, and specifically, the psychological community has not embraced repression theory, and that, in fact, serious disagreement exists. While the existence of consensus (or lack thereof) in the scientific community is a more familiar inquiry within the context of determining the admissibility of scientific evidence under the test enunciated in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), it is also a useful measure for this Court to evaluate the acceptance, and acceptability of a scientific theory.[9]

---

**9.** Dr. John Henderson, a psychiatrist in private practice in Baltimore, gave succinct testimony on this point:

"Q.: [a]re you familiar with any consensus opinion within the medical psychiatric profession or community that this—that adolescents can block the memory of multiple sexual abuse or physical abuse which has occurred over a period of time in the past ...?

. . . .

Finally, critics of repression theory argue that the "refreshing" or "recovery" of "repressed" memories is more complicated than repression proponents would have us believe. This argument takes two forms: (1) that memories refreshed with the assistance of a mental health professional are subject to manipulations reflecting the biases of the treating professional; and (2) that a repressed memory cannot be retrieved whole and intact from the cold storage of repression. Despite the defendants attempts to characterize this case as one of assisted or enhanced memory recovery, this is simply not a situation in which the plaintiffs' memories have been manipulated by one or more mental health professionals acting in the guise of treatment. Nonetheless, in crafting a rule we must consider the apparently very real dangers of iatrogenic (therapist created) memories of sexual child abuse. *See* Julie M. Kosmond Murray, *Repression, Memory, and Suggestibility: A Call for Limitations on the Admissibility of Repressed Memory Testimony in Sexual Abuse Trials,* 66 U.Colo.L.Rev. 477 (1995); Richard Ofshe & Ethan Watters, *Making Monsters,* 30 Soc'y 4 (March/April 1993); Thomas M. Horner, et al., *The Biases of Child Sexual Abuse Experts: Believing is Seeing,* 21 Bull.Am.Acad.Psychiatry Law 281 (1991).

■ After reviewing the arguments on both sides of the issue, we are unconvinced that repression exists as a phenomenon separate and apart from the normal process of forgetting. Because we find these two processes to be indistinguishable scientifically, it follows that they should be treated the same legally. Therefore we hold that the mental process of repression of memories of past sexual abuse does not activate the discovery rule. The plaintiffs' suits are thus barred by the statute of limitations. If the General Assembly should wish to rewrite the law, that is its prerogative and responsibility.[10]

_____

A.: I can opine that there is no consensus within the medical community that such a phenomenon can occur."

**10.** House Bill 326 (1994) would have removed cases of sexual child abuse from the statute of limitations applicable to other civil actions

IV

As an alternative theory of their case, Plaintiffs refer us to § 5–201:

### § 5–201.  Persons under a disability.

*(a) Extension of time.*—When a cause of action . . . accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitations after the date the disability is removed.

Similar to the discovery rule, § 5–201 attempts to differentiate between plaintiffs innocently unaware of their legal rights and those who have slumbered on their right to bring suit. In this respect, infants and persons with mental disabilities are considered innocent of their failure to file in a timely manner until three years after the disability has been removed. Plaintiffs in this case argue that their lack of memory of the trauma is proof that until recently they were mentally incompetent so as to toll the statute of limitations.

Our sister jurisdictions of Michigan and New Jersey have held that repressed memory of sexual abuse can constitute "insanity" under similar disability statutes. *Meiers–Post v. Schafer,* 170 Mich.App. 174, 427 N.W.2d 606 (1988); *Jones v. Jones,* 242 N.J.Super. 195, 576 A.2d 316 (1990), *cert. denied,* 122 N.J. 418, 585 A.2d 412 (1990). *See also,* Note, *Memory Repression: Should it Toll the Statutory Limitations Period in Child Sexual Abuse Cases?,* 39 WAYNE L.REV. 1589, 1603–05 (1993) [hereinafter *"Memory Repression"*]; Tina Snelling & Wayne Fisher, *Adult Survivors of Childhood Sexual Abuse: Should Texas Courts Apply the Discovery Rule?,* 33 S.TEX. L.REV. 377, 394–97 (1992).

Other states that have considered this issue, have rejected this view, holding that repression is not insanity or mental incompetence as envisioned by the disability statutes. *Memory Repression* at 1605 (*citing Smith v. Smith,* 830 F.2d 11 (2d

and create a longer period during which these claims can be brought. That bill died in the House Judiciary Committee.

Cir.1987) (applying New York law); *Hildebrand v. Hildebrand,* 736 F.Supp. 1512 (S.D.Ind.1990) (applying Indiana law); and *Lovelace v. Keohane,* 831 P.2d 624 (Okla.1992)).

In this state, the few decisions that have explained the scope of § 5–201 have been uniform in limiting its scope to persons who are insane. *Rettaliata v. Sullivan,* 208 Md. 617, 622, 119 A.2d 420, 422 (1956); *Decker v. Fink,* 47 Md.App. 202, 207, 422 A.2d 389, 392 (1980).

Plaintiffs suggest, however, that the use of the terms "disability" and "mental incompetence" in the statute suggest a broader reach than the term "insanity." This assertion is belied by the history of the statute. Although the concept is much older,[11] the current language of this statute was written in 1973 and adopted as part of the Code revision process and the creation of the Courts and Judicial Proceedings Article. Chapter 2, § 1 of the Acts of 1973, 1st Sp. Sess. In the former statutory arrangement, disabilities tolling the statute of limitations for mental infirmity were contained in several sections. Md.Code (1957, 1971 Cum.Supp.), Art. 57, §§ 2, 3, 3A, and 6. Section 2 tolled the statute of limitations for those who were *"non compos."*[12] Section 3 tolled the statute of limitations in specialties for those suffering from "insanity of the mind." Section 3A tolled the statute for the "insane." Section 6 tolled the statute of limitations for actions on sheriff's bonds for those who were *"non compos mentis."*

It was to eliminate precisely these sorts of semantic quagmires that the State undertook to revise the Code. In September 1971, the Governor's Commission to Revise the Annotated Code published its first *Revisor's Manual,* detailing the procedure for code revision. Among those rules was the

---

**11.** *See Ruff's Adm'r v. Bull,* 7 Har. & J. 14 (1825); *Haslett's Adm'r v. Glenn,* 7 Har. & J. 17 (1825) ("the cause of action accrues . . . from the time there is a competent person to bring it."). Both of these cases suggest that the common law test to determine the tolling of the statute of limitations is the legal capacity to bring suit.

**12.** An abbreviated form of "non compos mentis," Latin for "not sound of mind."

following dictate: "Do not use synonyms." *Id.* at 24. The favorable result of the code revision is clear: four provisions have been reduced to a single clear code section and four different phrasings of the same concept have been subsumed into one clear phrase: "mentally incompetent." There was no intent to broaden the reach of the tolling provisions. As the Revisor's Note to this section stated, "[i]t should be noted that the only disabilities under this section are infancy and insanity...." Chapter 2, § 1 of the Acts of 1973, 1st Sp.Sess.

We conclude that the reach of § 5–201 is no broader than it was under the 1957 code provision or under the common law of Maryland. Only those plaintiffs who are insane and "unable to manage [their] business affairs or estate, or to comprehend [their] legal rights or liabilities" are able to take advantage of § 5–201. *Decker v. Fink*, 47 Md. App. 202, 207, 422 A.2d 389, 392 (1980).

The trial judge found that:

"there is no question with the evidence that I have seen in this case that both Doe and Roe were very competent during the period of time, during the period of time from the years of their alleged abuse until the present time. They managed their affairs. One, raising four children in the process, and one continuing business and doing fairly well from a practical point of view, and managing their business affairs. So there is no issue of [insanity] in this case, from my finding of fact."

As there is no contrary evidence in the record, we shall affirm the summary judgment in favor of the defendants on the ground that plaintiffs' claims were barred by the statute of limitations three years after they reached their eighteenth birthdays, for Doe after August 11, 1974 and for Roe, after April 29, 1975.

***JUDGMENT AFFIRMED, WITH COSTS.***