796 A.2d 744

**BRAGUNIER MASONRY CONTRACTORS, INC.**

v.

**THE CATHOLIC UNIVERSITY OF AMERICA.**

**No. 87 Sept. Term, 2001.**

Court of Appeals of Maryland.

April 15, 2002.

James A. Johnson (Christopher R. West of Semmes, Bowen & Semmes, on brief), Baltimore, for petitioner/cross-respondent.

James B. Sarsfield (Hamilton and Hamilton, LLP, on brief), Washington, D.C., for respondent/cross-petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

CATHELL, J.

Bragunier Masonry Contractors, Inc., petitioner, as a subcontractor, initiated a breach of contract action and obtained a judgment in a Maryland court against Edward M. Crough, Inc. (Crough, Inc.), a general contractor, to recover approximately $200,000 allegedly due to petitioner for construction work performed by it for an earlier project (the "North Village Residence Project") on the campus of The Catholic University of America.

Petitioner, unable to collect this judgment from Crough, Inc., later commenced a garnishment proceeding in Maryland against The Catholic University of America, respondent, alleging that respondent held funds that remained payable to Crough, Inc. for a subsequent construction project (the "Old Gymnasium Project"). These funds were, under the garnishment proceeding, alleged to be payable to petitioner by respondent as a judgment debtor of Crough, Inc. Petitioner, as far as the record reflects, was not a subcontractor on the "Old Gymnasium Project."

Two years after petitioner commenced the garnishment action against respondent, the Circuit Court for Montgomery County held a trial on the merits. The Circuit Court issued its Memorandum Opinion on June 1, 2000, entering a judgment against respondent for the sum sought by petitioner as a

result of its prior judgment (including post-judgment interest) against Crough, Inc.

Respondent noted a timely appeal to the Court of Special Appeals. On July 31, 2001, the Court of Special Appeals reversed the judgment of the Circuit Court for Montgomery County. *The Catholic University of America v. Bragunier Masonry Contractors, Inc.*, 139 Md.App. 277, 775 A.2d 458 (2001).

On August 17, 2001, petitioner filed a Petition for Writ of Certiorari with this Court, and respondent subsequently filed a Cross Petition for Writ of Certiorari. On October 12, 2001, we granted both petitions. Petitioner presents two questions for our review:

"1. When a defrauded Creditor brings a fraudulent conveyance action by way of garnishment pursuant to Commercial Law Article § 15–209(a)(2), Md.Code, is the Creditor merely the subrogee of the Debtor/Transferor so that:

(a) The limitations period on the fraudulent conveyance action begins to run even before the fraudulent conveyance occurs; and

(b) The limitations period on the fraudulent conveyance action begins to run before the defrauded Creditor knows or has reason to know of the fraudulent conveyance?

"2. Did the Court of Special Appeals err in holding, as an alternative, that this case should be reversed and remanded because the trial court did not consider all of the facts and circumstances by erroneously applying the parol evidence rule and principles of equitable estoppel to find that a contract existed where, in fact, the trial court did hear and did consider all the evidence relating to the existence and validity of the contract, did not exclude any relevant evidence, and based its conclusion that a contract existed on the totality of the evidence, and not on application of the parol evidence rule or principles of equitable estoppel?"

In responding to the issues raised by petitioner, The Catholic University of America presents seven questions for our review:

"1.   Did the Court of Special Appeals properly decline to extend the limitations period by application of the discovery rule to a claim for fraudulent conveyance where the aggrieved party elected to forego a direct action in favor of a garnishment proceeding, a statutorily created remedy in derogation of the common law whose application therefor must be narrowly construed, and where the judgment creditor's claim depended on the viability of the judgment debtor's claim against the garnishee and which would be barred by limitations?

"2.   Did the Court of Special Appeals correctly decide that evidence demonstrating a lack of intent to form a binding contract by the parties to a purported agreement should have been received and considered by the trial court?

"3.   Should District of Columbia Law have been applied to this transaction which arises out of the formation and performance of contracts in the District of Columbia, particularly where all affected parties elected District of Columbia law to control their dealings?

"4.   Does the mandatory language of the garnishment rules operate to preclude recovery?

"5.   Having concluded that the question of whether a binding contract had been crated by the parties had not been properly decided by the trial court, did the Court of Special Appeals err in concluding that subject matter jurisdiction existed over a debt arising from that purported contract rather than the improvements to real property conveyed in the District of Columbia?

"6.   Was there a failure of proof of a fraudulent conveyance made by the judgment debtor where the only competent evidence demonstrated that the purported conveyance had no detrimental effect on the financial condition of the judgment debtor?

"7. Were nine years of post-judgment interest accumulated against the judgment debtor properly imposed on CUA as garnishee?"

We answer in the affirmative to respondent's question one. We hold that petitioner's cause of action is time-barred as the limitations period in which Crough, Inc. could have filed suit against respondent had already expired when petitioner initiated this garnishment action. As a result of our holding as to the question addressed, we need not resolve the other issues. We hold that the Court of Special Appeals properly decided the limitations issue. Accordingly, we affirm the judgment of the Court of Special Appeals.

## I. Facts

### a. Background

Edward M. Crough, the owner of Crough, Inc.,[1] was an alumnus of respondent. Mr. Crough had developed a successful construction business and had been involved in various construction projects on respondent's campus. In addition to participating in construction projects with respondent in the early 1980s, Mr. Crough became one of its personal benefactors.

In the latter part of the 1980s, respondent contracted with Crough, Inc. for it to serve as the general contractor for a dormitory construction project on respondent's campus called the "North Village Residence Project." Crough, Inc. subcontracted the masonry work for the "North Village Residence Project" to petitioner. The "North Village Residence Project" was timely and fully completed in 1990. Petitioner performed the masonry work on that project as required and received 90% of the agreed price under the contract from Crough, Inc., the general contractor. The remaining 10%, the amount in dispute in this action ($211,742.42 plus accrued interest), con-

---

1. Crough, Inc., was incorporated in Maryland with its principal place of business in Rockville, Maryland.

stituting the retainage,[2] was withheld by Crough, Inc. and not paid to petitioner, even after full completion of the project.

Around this same period in the late 1980s, respondent was considering another building project on its campus. It wanted to renovate an abandoned gymnasium and turn it into a new home for respondent's Department of Architecture. A proposal, initially termed the "Old Gymnasium Project," was drawn up and presented to respondent's then president, Reverend William J. Byron, S.J. (Father Byron), who was to be responsible for the necessary fund-raising. Father Byron approached Mr. Crough because of Mr. Crough's status as an alumnus and benefactor of respondent, with the plans for the "Old Gymnasium Project." Respondent sought to arrange to have Mr. Crough donate funds for this project, and in return respondent would name the renovated gymnasium the "Crough Center for Architecture."

After several meetings and Mr. Crough's rejection of several donative vehicles by which he could make such a gift to respondent, retaining both tax benefits of such a donation and some control over the use of the donation, Mr. Crough chose a particular solution. He decided to make the donation as a gift-in-kind, whereby his company, Crough, Inc., would donate the construction materials and services for the "Old Gymnasium Project" and, in that fashion, "gift" the building through the use of a Construction Manager Agreement (CMA) with respondent.[3]

---

2. "Retainage" is a percentage amount customarily withheld by an owner and/or a general contractor from the general contractor or subcontractor, as the case may be, until the total project, including "punch list" items, is complete and the job is accepted by the owner. Generally, if there are no problems with the performance of the contract or sub-contract, the retainage is paid upon the project's final acceptance.

3. The record reflects that several approaches, such as an outright monetary gift, a gift in trust, etc., were considered by Mr. Crough but then, for various reasons, rejected. Mr. Crough apparently ultimately chose the means actually used, a CMA with an understanding that collection efforts under the CMA would not be made for the project. It

On June 3, 1988, following this decision on the manner in which to make the donation to respondent, Crough, Inc. and respondent executed the CMA for the "Old Gymnasium Project." [4] The CMA, similar to a previous agreement executed by Crough, Inc. and respondent for the completion of the "North Village Residence Project," was lengthy, had several attachments, and was divided into parts stating that the total payment by respondent for the project was to be $3,149,000. It was apparently understood by Mr. Crough and respondent that respondent would not have to actually remit such sums to Crough, Inc. and in that way the gift could be consummated. There are indications that Mr. Johnson, Vice President of Crough, Inc., was unaware of the unwritten understanding between Mr. Crough and respondent.

In 1988, after execution of the CMA, construction commenced on the "Old Gymnasium Project." Throughout the construction, as apparently anticipated by Mr. Crough and respondent, no payment requisitions were submitted to respondent by Crough, Inc., given Mr. Crough's representations that the work and materials were a donation. No payment was proffered or made by respondent to Crough, Inc. on the project. Crough, Inc., however, continued to carry in its financial records account receivables that ultimately charged to respondent the amount of $3,149,000, the total amount stated in the CMA for the "Old Gymnasium Project."

Nearing the project's end in late 1989, Mr. Crough's company faced serious financial difficulties as a result of a downturn in the economy, particularly in the construction and real estate industries. Because of health problems, Mr. Crough began to leave the daily management of the company to its Vice President, Richard Johnson. As indicated, Mr. Johnson was appar-

is not necessary to address the validity of the CMA, and the parties' intent under it, in order to resolve the determinative issue in this case.

4.  Mr. Crough and Richard M. Johnson, Vice President of Crough, Inc. executed the CMA on behalf of Crough, Inc., while Father Byron and Sue D. Pervie, Vice President of Administration, executed the CMA on behalf of respondent.

ently unaware of the alleged "gift" arrangement between Mr. Crough and respondent. With regard to payment requisitions for the "Old Gymnasium Project," Mr. Johnson had previously been giving payment requisitions to Mr. Crough for submission to respondent. Mr. Crough did not forward these payment requisitions, nor did he tell Mr. Johnson that he did not do so.

In October of 1989, the "Old Gymnasium Project" was completed by Crough, Inc., accepted by respondent, and named, as allegedly promised, the "Crough Center for Architecture." Sometime after the onset of Mr. Crough's health problems and the transfer of operational responsibilities to Mr. Johnson, Mr. Johnson became aware of the fact that respondent had not made any payments under the CMA. On February 12, 1990, in light of Crough, Inc.'s worsening financial problems, Mr. Johnson and others representing Crough, Inc. met with Father Byron and others representing respondent. Specifically, Mr. Johnson asked about the lack of payments forwarded to Crough, Inc. on the project, and told respondent that Crough, Inc. was facing cash flow problems and was unable to pay a total of $1,257,000 to several of the subcontractors that had done work on the "Old Gymnasium Project." Father Byron then notified Mr. Johnson that the project had been a gift to respondent from Mr. Crough through his company, and that no payment would be given. Mr. Johnson responded that Crough, Inc. could not afford the project as a gift, because the company was in need of $2,000,000 to satisfy its debts and to meet current cash flow needs.[5] Mr. Johnson requested that respondent pay the sum of $2,000,000 to the company. Father Byron took this request to respondent's Board of Trustees, which agreed to lend

---

5. The $2,000,000 apparently included the sums due petitioner on the prior "North Village Residence Project." The record does not reflect whether, other than the sum due subcontractors on the "Old Gymnasium Project," respondent was made aware of the specific claims of other creditors of Crough, Inc. that were included within the balance of the $2,000,000 sum mentioned. At this point in time, petitioner had not obtained a judgment against Crough, Inc.

Crough, Inc. a lesser amount of $1,257,000 so it could pay the money owed to subcontractors on the "Old Gymnasium Project."[6]

On February 28, 1990, in a private meeting between Father Byron and Mr. Crough, Mr. Crough gave a letter to Father Byron, stating that "it is now and always has been my intention to pay for the total cost of the renovation of the old gymnasium as a gift to the University." Upon receipt of that letter, Father Byron gave Mr. Crough several two-party checks, totaling the $1,257,000 loan amount its Board of Trustees had agreed to "lend" petitioner. The checks were made payable, jointly, to Crough, Inc. and to each of the unpaid subcontractors on the "Old Gymnasium Project."[7] Mr. Crough agreed to repay that loan sum to respondent over the following twelve years.[8] Father Byron then presented Mr. Crough with a "Final Release of Claims and Lien Waiver" document, which Mr. Crough executed on behalf of his company. This document certified that Crough, Inc. received $1,257,000 as full payment for the construction of the "Old Gymnasium Project," even though the total $3,149,000 cost on the project was allegedly never due in the first place. After the $1,257,000 was tendered jointly to Crough, Inc. and the various subcontractors still due payment for work on the "Old Gymnasium Project," Crough, Inc. remained unable to satisfy the claim of petitioner for $211,742.42 in respect to its work on the "North Village Residence Project." From this time to the

---

6. Apparently, it was in respondent's interest to "lend" this sum in order to avoid the possibility of subcontractor liens against the "Old Gymnasium Project." It arranged to remit this "loan" sum in a manner that would protect it from claims of "Old Gymnasium Project" subcontractors. Respondent subsequently denied a request for additional payments to Crough, Inc. above this $1,257,000 amount.

7. None of these checks related to the "North Village Residence Project."

8. There were specific terms for this loan pertaining to the amount of the principal payment, an assignment of interest as collateral, and a redrafting of Mr. Crough's will; however, consideration of these details is not necessary for the resolution of the case *sub judice.*

time Crough, Inc. ceased to do business, the company was unable to pay its debts. It was insolvent.

### b. Facts Leading Up to Our Case

On September 25, 1991, petitioner filed in the Circuit Court for Montgomery County a breach of contract action against Crough, Inc. to recover the $211,742.42 owed as the retainage amount for the masonry contract for the "North Village Residence Project," which had been finished in 1990. The sum sued for was completely unrelated to the "Old Gymnasium Project." On December 12, 1991, the Circuit Court granted summary judgment in favor of petitioner and entered judgment against Crough, Inc. for $211,742.42 plus $5,000 in attorney's fees.

On July 31, 1992, in an effort to enforce this judgment, petitioner's lawyer spoke with Mr. Johnson of Crough, Inc., and it was during that conversation that petitioner learned of Mr. Crough's gift-in-kind, through the company, of the "Crough Center for Architecture" (the "Old Gymnasium Project"). Additionally, petitioner then learned of the "Final Release of Claims and Lien Waiver" that was executed in February of 1990.

Because of Crough, Inc.'s inability to pay petitioner's judgment, and having learned of the apparent uncollected account receivable that Crough, Inc. maintained as a part of its financial records from the "Old Gymnasium Project," petitioner sought to have respondent pay the sums due it on the "North Village Residence Project." Respondent refused. On November 29, 1994, in the Circuit Court for Frederick County, petitioner filed a Request for Writ of Garnishment against respondent based upon the judgment it had obtained against Crough, Inc. in 1991. Petitioner alleged that respondent owed funds to Crough, Inc. sufficient to satisfy the sums due to petitioner as a result of its 1991 judgment against Crough, Inc. Petitioner's request made reference to Maryland Rule 2–645 and Maryland Code (1975, 2000 Repl.Vol.), section 15–209 of the Commercial Law Article, both concerning garnishments. Petitioner's theory in the garnishment proceeding

against respondent, essentially, was that the CMA between Crough, Inc. and respondent was a contract that obligated respondent to pay Crough, Inc. the full $3,149,000 amount stated in the contract as the payment amount, not the lesser $1,257,000 "loan" amount leading to the release.

In other words, petitioner maintained that respondent remained indebted to Crough, Inc. for the full amount, which could, in turn, be used, via the garnishment action, to satisfy petitioner's judgment against Crough, Inc. Petitioner further added that the Final Release of Claims and Lien Waiver by which Crough, Inc. purported to release the full amount of debt, amounted to a fraudulent conveyance under Maryland Code (1975, 2000 Repl.Vol.), section 15–209 of the Commercial Law Article because Crough, Inc. was insolvent when the release was given. As a result, according to petitioner, under section 15–209 the debt forgiveness could be disregarded for purposes of garnishment and the balance due from the $3,149,000 amount, for garnishment purposes, remained the property of Crough, Inc. in possession of respondent and ultimately subject to attachment.

Prior to filing an answer to petitioner's request for writ of garnishment, respondent moved to dismiss for lack of personal jurisdiction and improper venue. Jurisdiction and venue issues were eventually resolved, with the case proceeding in the Circuit Court for Montgomery County. Accordingly, it was roughly two years after petitioner had filed a request for writ of garnishment against respondent that respondent filed an answer.

On May 15, 1996, respondent answered claiming that it was not in possession of any property of Crough, Inc. Respondent also asserted several defenses. Ultimately, two years after the date respondent filed its initial answer, respondent filed an amended answer to the request for writ of garnishment. In this amended answer, respondent asserted the defense of limitations. Thereafter, respondent filed a Motion for Summary Judgment on the ground of limitations. On October 13,

1999, argument was heard in the Circuit Court on the Motion for Summary Judgment and that motion was denied.

The case was tried before the Circuit Court for two days, continued, and later resumed on February 24, 2000, and completed on February 25, 2000. On June 1, 2000, the trial court issued a Memorandum Opinion and Order setting forth its factual findings and conclusions of law. The trial court found that the garnishment proceeding was not time barred, as petitioner's request for writ of garnishment was filed within three years of the date that petitioner, via its attorney, learned from Mr. Johnson of the alleged fraudulent conveyance (the Final Release of Claims and Lien Waiver forgiving a debt obligation while Crough, Inc. was insolvent and unable to pay its creditors), and that respondent had funds petitioner could attach via garnishment to satisfy its judgment against Crough, Inc.

The Circuit Court awarded petitioner $381,136.53 in damages, consisting of the $211,742.42 original judgment amount in its breach of contract action against Crough, Inc. and $169,393.93 in post-judgment interest. Respondent noted a timely appeal to the Court of Special Appeals, presenting to that court several questions for review. The Court of Special Appeals reversed the ruling of the Circuit Court for Montgomery County and held that the garnishment proceeding was time-barred, and that respondent had properly raised the limitations defense to petitioner's garnishment action. Furthermore, the intermediate appellate court held that the discovery rule did not apply to toll the start of the running of the general three-year limitation period until the time petitioner's attorney first learned of the alleged fraudulent conveyance. *The Catholic University of America v. Bragunier Masonry Contractors, Inc.*, 139 Md.App. 277, 775 A.2d 458 (2001).

Petitioner filed a Petition for Writ of Certiorari to this Court; respondent then filed a Cross Petition for Writ of Certiorari. We granted both petitions. *Bragunier v. Catholic University,* 366 Md. 246, 783 A.2d 221 (2001).

## II. Discussion

Both petitioner and respondent have presented various questions for our review in this convoluted case; however, we ultimately make our holding on the issue of the proper limitations period applicable to this garnishment action. As we have indicated, because of our holding as to the issue of limitations, we need not address the other questions presented for review or delve into the more detailed facts associated with those questions. At its core, the case *sub judice* concerns the applicable statute of limitations, under the circumstances, in this particular garnishment action.[9] The garnishment action in this case, although seeking to attach funds held by respondent and allegedly due to Crough, Inc., actually had its genesis in a prior breach of contract action arising out of a general contractor/subcontractor dispute between petitioner and Crough, Inc. In that prior dispute, in which respondent was not a party so far as we are aware,[10] petitioner obtained a judgment against Crough, Inc. The present case is an attempt, via garnishment, to collect on *that* judgment.

### a. Nature and Grounds of Garnishment as a Remedy

The Court of Special Appeals, in this case, stated that "[g]arnishment is a remedy created and controlled by statute." *Bragunier*, 139 Md.App. at 293, 775 A.2d at 467. *See Mears v. Adreon*, 31 Md. 229, 237 (1869) (stating that proceedings under attachment are a special remedy conferred by statute); *Chromacolour Labs, Inc. v. Snider Bros. Property Management, Inc.*, 66 Md.App. 320, 503 A.2d 1365 (1986) (noting that garnishment is a statutory proceeding). In *Northwestern*

---

9. Limitation issues affecting the time in which garnishment cases may be brought, generally, can differ from the assertion of limitations defenses that can be made by the garnishee against the claims an underlying judgment debtor might otherwise be able to assert. The instant case involves the latter situation.

10. The status of the present respondent in that prior case between Crough, Inc. and the present petitioner, is not, in any event, relevant in the current proceeding.

*National Insurance Co. v. William G. Wetherall, Inc.,* 267
Md. 378, 384, 298 A.2d 1, 5 (1972), we stated:

> "An attachment by way of garnishment issued after judgment is a mode of execution and its function is approximately the same as that of a writ of *fieri facias.* As attachment proceedings are in derogation of the common law, their existence is dependent upon special provisions authorizing them. Authority for courts in this State to entertain attachments after judgment has long been established in our laws. The origin of this authority is found in the Acts of 1715, Ch. 40, § 7. *W. Hodge and R. McLean, the Law of Attachment in Maryland,* § 251·(1895).... Under the established law of this State, a garnishment proceeding is, in essence, an action by the defendant (judgment debtor) against the garnishee for the use of the plaintiff (judgment creditor)." [Citations omitted.]

Recently, this Court, in *Parkville Federal Savings Bank v. Maryland National Bank,* 343 Md. 412, 681 A.2d 521 (1996) discussed the well-established nature and function of a garnishment proceeding. We stated:

> "A writ of garnishment is a means of enforcing a judgment. It allows a judgment creditor to recover property owned by the debtor but held by a third party....
>
> 'A garnishment proceeding is, in essence, an action by the judgment debtor for the benefit of the judgment creditor which is brought against a third party, the garnishee, who holds the assets of the judgment debtor. An attaching judgment creditor is subrogated to the rights of the judgment debtor and can recover only by the same right and to the same extent that the judgment debtor might recover.' "

*Id.* at 418, 681 A.2d at 524 (citing *Fico, Inc. v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430, 436 (1980) (citations omitted)). *See Hoffman Chevrolet, Inc. v. Washington County Nat'l Sav. Bank,* 297 Md. 691, 696, 467 A.2d 758, 761 (1983); *Northwestern Nat'l Ins. Co.,* 267 Md. at 384, 298 A.2d at 5; *Walsh v.*

*Lewis Swim. Pool Constr. Co.,* 256 Md. 608, 610, 261 A.2d 475, 476 (1970); *Peninsula Ins. Co. v. Houser,* 248 Md. 714, 717, 238 A.2d 95, 97 (1968); *Messall v. Suburban Trust Co.,* 244 Md. 502, 506–07, 224 A.2d 419, 421 (1966); *Cole v. Randall Park Holding Co.,* 201 Md. 616, 623–24, 95 A.2d 273, 277 (1953). The opinions of this Court have emphasized the principle, growing out of the nature and function of a garnishment proceeding, that the creditor merely steps into the shoes of the debtor and can only recover to the same extent as could the debtor.

In the case *sub judice,* the Court of Special Appeals appropriately noted how in garnishment proceedings, the judgment creditor (here petitioner) is subrogated to the rights of the judgment debtor (here Crough, Inc.). Moreover, the judgment creditor/garnishor can recover against the garnishee (here respondent) only to the extent that the judgment debtor could have done so. Thus, the nature of the rights acquired by petitioner are no more than the rights Crough, Inc. would have had against respondent. As we have indicated, and as the intermediate court stated, an action in garnishment is derived from statute, with the creditor stepping into the shoes of the debtor; the creditor's rights in garnishment, therefore, cannot rise above the rights the debtor would have had against the garnishee. *See Peninsula Ins. Co. v. Houser,* 248 Md. 714, 238 A.2d 95 (1968); *Messall v. Suburban Trust Co.,* 244 Md. 502, 224 A.2d 419 (1966); *Bendix Radio Corp. v. Hoy,* 207 Md. 225, 114 A.2d 45 (1955); *Thomas v. Hudson Sales Corp.,* 204 Md. 450, 105 A.2d 225 (1954); *Cole v. Randall Park Holding Co.,* 201 Md. 616, 95 A.2d 273 (1953).

In an attachment case involving claims to title to real property, we noted in our case of *Kolker v. Gorn,* 193 Md. 391, 399, 67 A.2d 258, 262 (1949), that:

"But attachment and execution proceedings seem to be in a class by themselves, where the real ownership is in issue and equitable defenses are available. We think an execution creditor, who is a stranger to the transaction ... stands

in the shoes of the debtor subject to all outstanding equities
..." [Citations omitted.]

We noted well over a hundred years ago that:

"There is nothing in the attachment law of this State to justify the conclusion that it was designed, by allowing garnishment to be made, to place the garnishee in a worse position, in reference to the rights and credits attached, than if he had been sued by the defendant. The attaching creditor seeks to have himself substituted to the rights of his debtor as against the garnishee, and by laying his attachment, he acquires no superior right to that of his debtor. The right of condemnation must, therefore, be subject to any such right of set-off or discharge existing at the time of garnishment, as would be available to the garnishee if he were sued by the defendant. Any other rule would, in many cases, work gross injustice, and might, moreover, be subject to great abuse."

*Farmers & Merchants Bank v. Franklin Bank,* 31 Md. 404, 412 (1869); *see Employers' Liability Assur. Corp. v. Perkins,* 169 Md. 269, 181 A. 436 (1935); *Farley v. Colver,* 113 Md. 379, 77 A. 589 (1910).

Additionally, the opinions of other courts have emphasized the principle that the creditor merely steps into the shoes of the debtor and ordinarily can only recover to the same extent as could the debtor, or that the nature of the creditor's rights cannot rise above those of the judgment debtor.[11] *See Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.,* 183 F.3d 1277, 1286 (11th Cir.1999) ("the plaintiff [garnishor] steps into the shoes of the judgment debtor and can assert only the rights that the judgment debtor could have asserted...."); *Sapp v. Greif,* 961 F.Supp. 243, 246 (D.Kan.1997) (in garnishment, plaintiff-creditor stands in shoes of defendant-debtor); *Ellefson v. Centech Corp.,* 606 N.W.2d 324, 334 (Iowa 2000)

---

11. Because we resolve the present action on the basis of limitations, we do not address whether, under certain circumstances, a creditor might have greater rights than a debtor in a direct action to set aside a fraudulent conveyance.

(right of the judgment creditor is measured by the right of the debtor); *Ray v. Caudill,* 266 Kan. 921, 924, 974 P.2d 560, 562 (1999) ("In a garnishment proceeding, the creditor ... takes the place and stands in the shoes of its debtor, Caudill, taking only what he could enforce against the third-party garnishee."); *Culie v. Arnett,* 765 P.2d 1203, 1205 (Okla.1988) (judgment creditor stands in the shoes of the judgment debtor and may claim no greater rights against the garnishee); *Rice v. American Communications Consultants of North America,* 31 P.3d 1075, 1077 (Okla.Civ.App.2001) ("In a garnishment proceeding the judgment creditor stands in the shoes of the judgment debtor to enforce a liability owed to the latter by a third party—the garnishee. The former may claim no greater rights against the garnishee than the latter himself possesses.") (quoting *Culie,* 765 P.2d at 1205); *Rowley v. Lake Area Nat'l Bank,* 976 S.W.2d 715, 719 (Tex.App.1998) ("By strict compliance with the garnishment statutes, a plaintiff in garnishment merely steps into the shoes of his debtor as against the garnishee...."); *Network Solutions, Inc. v. Umbro Int'l, Inc.,* 259 Va. 759, 768, 529 S.E.2d 80, 85 (2000) ("[A] proceeding in garnishment is substantially an action at law by the judgment debtor in the name of the judgment creditor against the garnishee, and therefore the judgment creditor stands upon no higher ground than the judgment debtor and can acquire no greater right than such debtor ... possesses.") (quoting *Lynch v. Johnson,* 196 Va. 516, 521, 84 S.E.2d 419, 422 (1954)).

In *Sapp v. Greif,* 961 F.Supp. 243 (D.Kan.1997), a case with somewhat similar facts, the federal District Court also held that a garnishor stands in the shoes of its debtor. In that case, an insured bank director joined in a mutual release with the insurance company that carried director's coverage. The insurance company, the garnishee, contended that it was not subject to a garnishment because it was not holding any funds of the debtor, nor was it liable to pay any funds on behalf of the judgment debtor, because "Mr. Greif, in whose shoes the plaintiffs stand, released the Garnishee from 'any and all claims by any person or entity against any of the Settling

Defendants in their capacities as directors and/or officers of the Banks....' " *Id.* at 246. The plaintiffs contended that the release was not binding on them because they were not parties to it, and that the court should not permit the garnishee to conspire and collude with Mr. Greif to arbitrarily take away their rights. The court responded in relevant part:

"Kansas law provides that a garnishment action is the proper procedure for determining a garnishee-insurer's liability. However, the plaintiff-creditor, who stands in the shoes of the defendant-debtor, is only entitled to enforce that which the defendant-debtor could enforce against his or her insurer.

. . .

"Kansas law does not require an officer/director of a corporation to obtain or maintain director/officer insurance. Nor does Kansas law prevent an officer/director of a corporation from releasing his or her director/officer insurer from liability....

. . .

"Thus, because Mr. Greif legally waived his rights under the Policy, the plaintiffs, as Mr. Greif's creditors, have no rights under the Policy."

*Id.* at 246 (citations omitted). *See also Union Bank v. Federal Deposit Ins. Corp.,* 111 Nev. 951, 956, 899 P.2d 564, 567 (1995) ("Consistent with the principle that a garnishor stands in the shoes of the debtor, NRS 31.360 simply affords a garnishee the right to deduct out of the property of the debtor, prior to payment to the garnishor, all demands against the debtor...."). In the old garnishment case of *Jaseph v. People's Savings Bank,* 132 Ind. 39, 47, 31 N.E. 524, 527 (1892), the Supreme Court of Indiana stated: "[T]he general rule [is] that the creditor stands in the shoes of the debtor; and unless the debtor himself could have maintained an action against the garnishee ..., the creditor can not hold him as garnishee."

*See also Day's Executrix v. Traders' Nat'l Bank,* 232 Ky. 662, 24 S.W.2d 576 (1930).

In examining the limitations period in a garnishment action, the Supreme Court of Arkansas stated:

"Whether we consider either date as the cessation of Andrews' authority as a licensed agent, it is obvious that the two-year statute of limitation upon the bond is a bar to this action. This is true because it was not until May 5, 1964, the issuance of garnishment, that any action was brought to enforce liability upon the securities posted in lieu of the required bond."

*Wells v. Hill,* 239 Ark. 979, 981, 396 S.W.2d 946, 947 (1965).

**b. Limitations Period Generally and the Discovery Rule**

Generally, in Maryland, the applicable statute of limitations for most actions at law is three years as set forth in Maryland Code (1973, 1998 Repl.Vol.), section 5–101 of the Courts and Judicial Proceedings Article, which reads that, "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." We noted relatively recently in *Doe v. Maskell,* 342 Md. 684, 689, 679 A.2d 1087, 1089 (1996) that:

"Statutes of limitations, ... are intended simultaneously to 'provide adequate time for diligent plaintiffs to file suit,' to 'grant repose to defendants when plaintiffs have tarried for an unreasonable period of time,' and to 'serve societal purposes,' including judicial economy. There is no magic to a three-year limit. It simply represents the legislature's judgment about the reasonable time needed to institute suit. We have also observed that:

'Statutes of limitation find their justification in necessity and convenience rather than logic. They represent expedients rather than principles.'" [Citations omitted.]

The Legislature and this Court, however, have created special provisions for certain causes of action, such as when, under certain circumstances, the potential plaintiff cannot, and

does not, "discover" that the wrong has occurred until a period of time has elapsed after the wrong was actually committed. In those specific circumstances, the period for the running of the statute may be tolled until "discovery" of the wrong. Thus, the general three-year period is not always applicable. However, when the date of the breach and the discovery of the breach are the same, the discovery rule is satisfied.

If there is fraud concealing the cause of action, Maryland Code (1973, 1998 Repl.Vol.), section 5–203 of the Courts and Judicial Proceedings Article provides that "[i]f the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." The record in the case at bar is devoid of evidence that respondent had any knowledge of the debt owed by Crough, Inc. to petitioner in respect to the prior project, at the time it entered into the arrangement with Mr. Crough for the gift of the "Old Gymnasium Project." There is also no indication that respondent interfered in any way with the timing of the garnishment action filed by petitioner.

The limitations issue in this case does not relate to when petitioner discovered the alleged fraudulent conveyance (the release). That discovery might be relevant if petitioner was standing in its own shoes. In a garnishment action, the type of action petitioner chose to file, a garnishor stands in the shoes of its judgment debtor, the party who, in the present case, would have been subjected to a limitations defense had it filed suit against respondent. Respondent committed no fraud that would have concealed from Crough, Inc. its right to file a cause of action against respondent. The release, itself, constituted knowledge of the rights being released and did not constitute a fraud as between the parties to it. It was, in effect, a knowing and intentional agreement between the two entities.[12] In this case, the limitations issue relates to the

---

12. The record does not reflect that when the release was executed, respondent was even aware of any specific debts owed by Crough, Inc.

point in time that respondent's obligation (if any existed) to pay Crough, Inc. became an obligation to pay. That obligation to Crough, Inc., if it existed, became an obligation when the "Old Gymnasium Project" was completed. Crough, Inc. was then fully aware of the point when the contract was completed. It, in essence, "discovered" the breach on the date of the breach. As stated, *supra*, in a garnishment proceeding the creditor steps into the shoes of the debtor. Therefore, the creditor also steps into the shoes of the debtor for limitations purposes. When petitioner filed a request for writ of garnishment against respondent, petitioner subjected itself to the respondent's remedies, including its limitations defenses. Petitioner became subrogated to any rights the judgment debtor, Crough, Inc., had against the garnishee/respondent, *but only those rights.*

The only underlying action available for Crough, Inc. against respondent in a Maryland court would be a breach of contract action for any nonpayment under the CMA that Crough, Inc. might have demanded. Crough, Inc., in the absence of any limitations provision in the CMA to the contrary, had a possible direct action against respondent for breach of contract for a period of three years from the date construction on the "Old Gymnasium Project" was completed. When petitioner later filed a writ of garnishment against respondent, and at that time "stepped into the shoes" of Crough, Inc., petitioner was entitled, and only entitled, to any sums which Crough, Inc. might have been entitled to recover from respondent. Petitioner, at the same time, was subject to any defenses respondent might have asserted against Crough, Inc., including the defense of limitations.

Petitioner's rights cannot exceed those of Crough, Inc., and allowing petitioner to bring this garnishment action beyond the three-year period to which Crough, Inc. was entitled would accomplish exactly that. Thus, petitioner, like Crough, Inc., only had the right to recover the debt in a direct action

to others. Such knowledge, or lack of knowledge, is not, in any event, relevant under the circumstances of this garnishment action.

brought against respondent within three years of October of 1989. Crough, Inc., as far as we have been advised, has never filed an action against respondent in respect to the "Old Gymnasium Project." It was not until November 29, 1994 that petitioner filed the request for writ of garnishment against respondent.[13] Limitations is a proper affirmative defense to be raised by respondent against petitioner, as respondent would have had this same affirmative defense available had Crough, Inc. brought such an action on November 29, 1994. Petitioner's suit is time-barred.

■ Petitioner asks us to apply the discovery rule to its garnishment cause of action. In *Hahn v. Claybrook*, 130 Md. 179, 100 A. 83 (1917), a medical malpractice case, this Court announced the discovery rule which is that a cause of action accrues when a plaintiff knew or should have known that actionable harm was done. It has since been expanded to other causes of action. Here, as with third-party beneficiary actions, the respondent stands in another's shoes.

The case of *Jones v. Hyatt Insurance Agency, Inc.*, 356 Md. 639, 741 A.2d 1099 (1999), involved a breach of contract claim by an accident victim against the other party's insurance agent, based upon the third-party beneficiary's assertion that the agent had been negligent in not procuring liability insurance for the alleged tortfeasor in the underlying action, which would have benefitted the third-party victim had it been obtained. We held that because the alleged tortfeasor in the underlying action knew of, or should have discovered, the agent's failure to procure the insurance more than three years prior to the third-party beneficiary's filing of suit against the agent, the statute of limitations, as to the breach of contract action, had expired. We stated.

---

13. We note that petitioner, while attempting to collect its judgment from Crough, Inc., learned in July of 1992 that Crough, Inc. and respondent had executed some sort of release of claims and lien waiver. Theoretically, petitioner did have until October of 1992, just as Crough, Inc. would have had under the general limitations period, to bring suit against respondent to try and recover the debt. Petitioner did not do so.

"It is a well-settled principle that a third-party beneficiary to a contract 'takes subject to the same defenses against the enforcement of the contract, as such, as exist between the original promisor and promisee.' ... That such defenses include the expiration of the limitations period was established by this Court in *Spates v. Spates,* 267 Md. 72, 296 A.2d 581 (1972)....

"The statute of limitations on the Joneses' contract claim began to run when the cause of action for breach of contract accrued. Under the principles set forth in our cases, the cause of action accrued when Hyatt breached its contract to procure insurance and when the breach was or should have been discovered.... Since the discovery rule is now generally applicable in civil actions, accrual of the cause of action was postponed until K & D and/or the Joneses knew or should have known of the breach....

. . .

"In contrast, a contract to obtain insurance is ordinarily breached immediately upon the agent's or broker's failure to procure the insurance in a timely manner....

"Thus, the Joneses' reliance on our cases involving breaches of insurance policies, most notably *Washington Transit v. Queen, supra,* [324 Md. 326, 597 A.2d 423 (1991)], and *Vigilant v. Luppino, supra,* [352 Md. 481, 723 A.2d 14 (1999)], is misplaced. The essential difference between the nature of the two contracts, *i.e.,* an insurance policy and an agreement to procure such a policy, necessitates our holding that the statute of limitations on the Joneses' third-party beneficiary cause of action in contract began to run as soon as Hyatt's failure to procure insurance for K & D was discovered. The contract was clearly breached long before the Joneses obtained a judgment against K & D.

"Moreover, both K & D and the Joneses discovered or should have discovered Hyatt's breach of its contract to

procure insurance more than three years before the present action was filed."

*Id.* at 647–50, 741 A.2d at 1103–05 (some citations omitted).

As we have indicated, the point in time when a garnishee discovers that two other contracting parties have entered into releases of contract sums is not, generally, relevant to the point in time when underlying parties become subject to limitations defenses. In the case *sub judice*, the discovery rule, while applying to the relationship between The Catholic University of America and Crough, Inc. makes no difference. If there was a breach of contract between them, Crough, Inc. was at all times from the point of the completion of the contract for the "Old Gymnasium Project" aware of, *i.e.*, had "discovered," the nonpayment, and thus had notice of any possible breach of contract.

### III. Conclusion

■ Petitioner chose to bring this garnishment action, and upon choosing to do so, had only the rights available to Crough, Inc., the judgment debtor. Petitioner was also subject to all defenses applicable to the judgment debtor's claim (if any claim existed) against respondent. In essence, what petitioner is seeking to do by this garnishment action is to circumvent the limitations period set forth by Maryland statute and obtain rights in excess of the rights of the judgment debtor. There is no applicable exception to the general three-year period available to petitioner.[14] Moreover, the discovery rule applicable under the circumstances of the case was satisfied when Crough, Inc. became aware that the contract was completed. The date when petitioner "discovered" the release is simply not relevant in this case. Petitioner stood in the shoes of its debtor. The facts are clear, petitioner, as a garnishor, had only the general three-year limitation period, the same limitation period available to its judgment debtor,

---

14. There is no dispute between the parties as to the applicable period of limitations, only as to when the period began to run. No issue as to "specialities" has been presented.

Crough, Inc., to bring this type of action by way of garnishment free of the defense of limitations. Respondent properly raised the affirmative defense of limitations, and the Court of Special Appeals was correct in reversing the trial court's findings and conclusions as to the limitations issue.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**