841 A.2d 53

BACON & ASSOCIATES, INC., et al.

v.

ROLLY TASKER SAILS (THAILAND) CO., LTD.

No. 0067, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Jan. 29, 2004.

618

Rignal W. Baldwin (Jonathan P. Kagan, Brassel & Baldwin, PA, on brief), Annapolis, for appellant.

Anthony M. Conti, Baltimore, for appellee.

Argued before KRAUSER, LAWRENCE F. RODOWSKY (retired, specially assigned), and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

RODOWSKY, J.

The appellants, Bacon & Associates, Inc. (Bacon), an Annapolis, Maryland-based sail retailer, and Merilyn "Dixie" Bacon (Mrs. Bacon), Bacon's sole owner and president, seek reversal of a judgment of the Circuit Court for Anne Arundel County rendered on a jury verdict in favor of the appellee, Rolly Tasker Sails (Thailand) Co., Ltd. (RTS Thailand), a Thailand-based sail manufacturer and distributor.

Appellants present the following issues concerning the jury verdict:

"I. Whether the jury verdict should be reversed because of confusion created by verdict sheets with inconsistencies, contradictions and clerical errors.

"II. Whether the jury verdict should be reversed because the jury improperly awarded $54,000.00 in administrative damages that were not permitted by law or supported by any evidence.

"III. Whether the jury verdict should be reversed based on the lower court's erroneous jury instructions regarding the statute of limitations in breach of contract actions.

"IV. Whether the jury verdict should be reversed based upon the lower court's error in permitting appellee to present evidence regarding claims of [companies related to the plaintiff by common ownership that] were not parties to the case."

Preliminarily, however, the appellee asserts that the appeal was noted too late.

For the reasons explained below, we shall address the merits and affirm the judgment.

## Facts and Legal Proceedings

Rolland Tasker (Mr. Tasker),[1] an Australian national, formed Rolly Tasker Sails Pty. Ltd. (RTS Australia) in 1956 to produce sails. Initially working out of a rented shed, he used the money earned from selling sails to fund his trips to sailing competitions. Because of the high cost of importing American sail cloth into Australia, Mr. Tasker formed Rolly Tasker Hong Kong, Limited (RTS Hong Kong) in 1963, and had moved his operation to Hong Kong by 1971. Mr. Tasker was the sole owner of RTS Hong Kong and RTS Australia.

The business relationship with appellants commenced in 1971, when RTS Hong Kong began shipping sails on consignment to Bacon in Annapolis. The terms of this consignment agreement, which was oral, will be discussed, *infra.* Bacon received three shipments of sails from the Hong Kong facility before Mr. Tasker moved his operation back to Australia in 1973.[2] According to Mr. Tasker, "[t]he [Bacon] account was transferred to Australia . . . [a]nd all the ledger cards at that time."

From 1973 to 1990, Mr. Tasker did business through RTS Australia. During this period, RTS Australia forwarded seven shipments of sails to Bacon on consignment. According to Mr. Tasker, all payments by Bacon made during this period were made to RTS Australia, even for sails that had been part of the three shipments from Hong Kong. Bacon never objected to this arrangement.

In 1990, Mr. Tasker formed the appellee, RTS Thailand, and moved his operation to Phuket, Thailand. At the time of trial, Mr. Tasker owned a sixty percent share of the Thai entity, his wife owned thirty-nine percent, and the remaining shares were

---

1. Mr. Tasker has sixty years of experience in the sport of sailing and in the arts of boat-building and sail-making. He raced a sailboat, hand-built by him, in the 1956 Olympic games in Melbourne, Australia, won a World Yachting Championship title, and is a member of the Australian Sports Hall of Fame.

2. RTS Australia apparently was still in existence during the time Mr. Tasker was operating out of Hong Kong.

split among Mr. Tasker's son, Michael, and several Thai employees. Between 1990 and 1998, seven sail shipments, and several non-sail shipments, were forwarded to Bacon from the Thailand facility.[3] From 1995 to 1998, all payments made by Bacon for Tasker entity sails were to be deposited into an account in Annapolis (the Alex Brown Account).[4]

According to Mr. Tasker, all the accounts of Tasker entities, including their accounts with Bacon, had traveled with him to his present entity, RTS Thailand. Regarding the Hong Kong shipments, Mr. Tasker stated that "[t]he shipment [account] was transferred to [RTS] Australia. And in 1994, the authority was transferred to [RTS] Thailand." He admitted, however, that RTS Hong Kong received no monetary consideration for its transfer of the account documents and paperwork to RTS Australia, and RTS Australia received no compensation for its transfer of account documents to RTS Thailand.[5]

Under the consignment arrangement between the parties, Tasker entities would ship sails to Bacon, with a bill of lading and an invoice stating the net price for each sail. Once it received a shipment, Bacon would inspect and measure the sails, assign a catalog number, and fix a "retail fair market

---

3. Although the Tasker entity products consigned to Bacon could include goods other than sails, the parties have not made any distinction that is material to the issues on this appeal between sails and other product lines. Consequently, for the sake of simplicity, we shall refer simply to "sails."

4. An Alex Brown Cash Reserve Fund account was opened on October 30, 1989, in the names of Mr. Tasker, his wife, and Mrs. Bacon. Mr. Tasker explained that Mrs. Bacon's name was placed on the account because neither Mrs. nor Mr. Tasker was a United States citizen. Bacon was expected to make a monthly deposit into this account equal to the net invoice price of all Tasker entity sails sold in the preceding month. Mr. Tasker testified that he and his wife occasionally drew funds from this account for personal expenses.

5. Copies of the checks written by Bacon based on sales of Tasker entity consignments are included in the record. From August 1971 to April 1973, these checks were written to RTS Hong Kong. From May 1973 to June 1981, the checks were written to "Rolly Tasker" or "Mr. Rolly Tasker." From July 1981 onward, the checks were written to "Rolly Tasker[,] Rolly Tasker Pty., Ltd."

value price" for each sail. A "sail card" then was prepared for each catalog number. Sails were stored in Bacon's Annapolis warehouse until sold.[6]

Bacon would acknowledge receipt of each sail consigned to it, stating its catalog number and its retail price. Bacon advertised Tasker entity sails in its catalog and on its website. If a customer purchased a consigned sail from Bacon, Bacon would mark "sold" on the sail card. Once the purchasing customer's ten-day window to inspect and return the sail expired, Bacon was to issue a check for the net invoice price. In the early years of the relationship, this check was sent directly to the facility at which Mr. Tasker was based. In later years, Bacon deposited its check into the Alex Brown Account and sent an itemized check stub to notify the consignor. The sail then would be deleted from Bacon's inventory list. The difference between the net invoice price assigned to the sail by the consignor and the retail sale price set by Bacon constituted Bacon's gross profit.

After a March 1998 shipment from RTS Thailand, the relationship began to unravel, as evidenced by correspondence between the parties. RTS Thailand, as sole plaintiff, filed the complaint in this action on June 29, 2001.[7] The complaint sounded in breach of contract (Count I), quantum meruit (Count II), unjust enrichment (Count III), breach of bailment agreement (Count IV), trover and conversion (Count V), and constructive fraud (Count VI). RTS Thailand alleged that,

---

**6.** The parties also had a "trading account," under which Bacon purchased sails for its own account, for resale. Mr. Tasker explained the difference as follows: "A trading account is where we sell sails and they are paid for in 30 days. But a consignment account is where we sell sails and they are paid for after sale." The claims underlying this appeal relate only to the consignment account.

**7.** A first amended complaint continued to name RTS Thailand as the sole plaintiff. A second amended complaint, however, named multiple plaintiffs, by including RTS Thailand, RTS Hong Kong, RTS Australia, and Mr. Tasker, individually, and as trustee for the Tasker entities. On December 10, 2002, at appellants' request, the circuit court rejected the second amended complaint, so that RTS Thailand proceeded to trial as the sole plaintiff. We discuss this issue further in Part IV.

since July 1998, Bacon had not made any payments arising from sales of consigned merchandise. In their answer, appellants denied that they had failed to pay any amounts due. Additionally, they asserted a number of specific defenses, including limitations.

During the early stages of the litigation, Bacon returned two shipments to RTS Thailand for credit. The returned sails had been consigned by RTS Hong Kong, by RTS Australia, and by RTS Thailand. The first shipment was valued at $72,269.75, while the second shipment was valued at $1,000.

As a result of amendments and rulings on motions, only the following theories of the case were submitted to the jury: as to Bacon, breach of contract, breach of bailment agreement, trover/conversion, and fraud; and, as to Mrs. Bacon, trover/conversion and fraud. The jury found against Bacon and Mrs. Bacon and awarded $345,327 in damages and $78,660 in interest to RTS Thailand. Aggrieved, Bacon and Mrs. Bacon noted this appeal.

## Timeliness of Appeal

We first must address appellee's motion to dismiss the appeal as untimely. Underlying appellee's motion are the following facts. The jury returned its verdict on December 19, 2002, and on December 24 the clerk prepared, signed, and entered judgments on the docket in accordance with Maryland Rule 2–601. The judgments were entered against each appellant in favor of RTS Thailand, RTS Hong Kong, RTS Australia, and Mr. Tasker.

More than ten days thereafter, on January 6, 2003, appellants filed a motion for judgment notwithstanding the verdict, or to revise. At a February 10, 2003 hearing, the court ordered the clerk to revise the judgment to reflect that it was entered in favor of RTS Thailand only. The court denied all other relief requested. In making the docket entries that day to comply with the court's order, the clerk deleted RTS Australia, RTS Hong Kong, and Mr. Tasker as judgment holders only as to Mrs. Bacon, but no correction was made as to the judgment against Bacon. It was not until March 6,

2003, that the clerk docketed the change in the judgment against Bacon to reflect that it stood only in favor of RTS Thailand. Appellants' notice of appeal was filed March 20, 2003, within thirty days of the March 6, 2003 order.

Appellee's motion argues that, because appellants' post judgment motion to revise was not filed within ten days of the *original* December 24, 2002 judgment, the motion operated only as one under Maryland Rule 2–535(a) so that the time for appeal continued to run.[8] *See* Md. Rule 8–202(c).

■ We agree with appellants that under *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898 (1990), the appeal was timely. *Gluckstern* held that, when a timely motion to revise the judgment is filed, and no appeal is noted prior to the resolution of the motion, if the circuit court subsequently revises the judgment, the revised judgment becomes the final judgment. Quoting from its decision in *Yarema v. Exxon Corp.,* 305 Md. 219, 503 A.2d 239 (1986), the Court of Appeals explained:

> " 'Rule 2–535(a) ... authorizes the circuit court to exercise revisory power over a judgment on a motion filed within thirty days from the judgment. Nevertheless, it is settled that neither the timely filing of a motion to revise a final judgment nor the court's denial of such motion, absent an order staying the operation of the judgment, affects the finality of the judgment or the running of the time for appeal. But when a motion under Rule 2–535(a) to revise a final judgment is filed within thirty days and the circuit court in fact revises the judgment, and there has been no intervening order of appeal, the prior judgment loses its finality and the revised judgment becomes the effective final judgment in the case.' "

*Gluckstern,* 319 Md. at 651, 574 A.2d at 906 (citations omitted).

Because the notice of appeal was filed within thirty days of the revised judgment, which, under the rule in *Gluckstern,*

---

**8.** Under Rule 2–535(a), "[o]n motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment[.]"

effectively superseded the original judgment in this case and became a new final judgment, the appeal is properly before this Court.

## I. Verdict Sheets

Appellants first assert that the judgment should be reversed because of the "confusion created by verdict sheets with inconsistencies, contradictions and clerical errors." Appellants' argument appears to be a mix of a challenge to the jury verdict itself, and a challenge to the form of the verdict sheet.

 We first address the legitimacy of the jury's verdict. "Ordinarily, this court will not interfere with a jury verdict, even one that is inconsistent." *Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123, 149, 603 A.2d 1301, 1314, *cert. denied*, 327 Md. 525, 610 A.2d 797 (1992). When the verdict is irreconcilably inconsistent or defective, however, such interference has been held necessary. "Where the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant, the verdict is irreconcilably defective." *S & R, Inc. v. Nails*, 85 Md.App. 570, 590, 584 A.2d 722, 731 (1991), *rev'd on other grounds*, 334 Md. 398, 639 A.2d 660 (1994); *see, e.g., Southern Mgt. Corp. v. Taha*, 378 Md. 461, 479, 836 A.2d 627, 637 (2003) (holding jury verdict that "exonerat[ed] named individual employee-agent defendants while purporting to inculpate the corporate defendant" irreconcilably inconsistent). It is through the lens of these legal standards that we examine the jury verdicts in this case.

 The original verdict sheet stated the following:

"1. In the event that there are moneys due from either defendant, do you find that [the sole named plaintiff, RTS Thailand] is entitled to collect any sums for [RTS Hong Kong] and [RTS Australia]?

 <u> √ </u> Yes <u> </u> No

"2. If yes, do you find that there has been:

"a. Breach of Contract

 _√_ Yes ___ No

"b. Conversion

 _√_ Yes ___ No

"c. Fraud

 ___ Yes _√_ No

"3. If you answered yes to 2(a), 2(b), or 2(c), then state the amount of damages that you award:

"Amount: *$291,327*

"4. If you answered no to 2(a), 2(b), or 2(c), do you find that an agreement existed between Bacon ... and [RTS Thailand]?

"a. Breach of Contract

 _√_ Yes ___ No

"b. Conversion

 _√_ Yes ___ No

"c. Fraud

 ___ Yes _√_ No

"5. If you answered yes to 4(a), 4(b), or 4(c), state the amount of damages that you award:

"Amount: *$132,660* ($78,660 interest[,] $54,000 damages)

"6. Do you find that Mrs. Merilyn Dixie Bacon committed fraud or conversion?

 _√_ Yes ___ No

"7. Do you find that Rolly Tasker Sails (Thailand) Co., Ltd. knew or should have known of the wrongful conduct and damages prior to June 29, 1998?

 ___ Yes _√_ No

"If so, what amount of damages, if any, should Rolly Tasker Sails (Thailand) Co., Ltd. have been aware of prior to June 29, 1998?

"*Amount: $ N/A* "

Because of the wording of question 4, the court prepared a Supplemental Verdict Sheet, aimed at clarifying the jury's intent. See *Nails v. S & R, Inc.*, 334 Md. 398, 412, 639 A.2d 660, 667 (1994) ("[I]n a civil case, after a jury has rendered an initial verdict, the trial judge ordinarily may ask the jury to amend, clarify or supplement the verdict in order to resolve an ambiguity, inconsistency, incompleteness, or similar problem with the initial verdict, up until the jury has been discharged and has left the court room"). After ten minutes of deliberation, the jury returned the Supplemental Verdict Sheet with the following findings:

"1. How much do you award as damages for [RTS Hong Kong] AND [RTS Australia] COMBINED

| $0 | $0 |
|---|---|
| amount | interest (if any) |

"2. How much do you award as damages for [RTS Thailand] *separately*

| $345,327 | $78,660 |
|---|---|
| amount | interest (if any) |

"3. What is the total award of all damages awarded in # 1 and # 2 *$ 423,987*"

(Emphasis in original.)

Contrary to appellants' contention, we agree with appellee that the Verdict Sheet and Supplemental Verdict Sheet reflect a "clear and decisive" verdict in favor of RTS Thailand. When these verdict sheets are read together, it is clear that the jury's intent was that RTS Thailand be permitted to recover on the appellants' obligations resulting from the Tasker entities' entire thirty-year relationship with Bacon and Mrs. Bacon. The verdicts are not inconsistent, much less irreconcilably so. Under the original verdict sheet, the jury found that RTS Thailand was entitled to collect $291,327 due to RTS Hong Kong and RTS Australia, and that Bacon owed RTS Thailand, directly, an additional $54,000. Thus, on the original verdict sheet, the jury awarded RTS Thailand $345,327 and awarded no damages to the other Tasker entities, just as it did

on the Supplemental Verdict Sheet.[9] The verdict sheets exhibited a clear and consistent intent on the part of the jury, which we shall not disturb.

■ Furthermore, we decline to address appellants' challenge to the *form* of the verdict sheets because appellants failed to object at trial to the wording of those verdict sheets. As appellee points out in its brief, by not timely objecting to the form of a special verdict sheet, a party waives the right to object on appeal. Md. Rule 2–522(c); *Edwards v. Gramling Eng'g Corp.*, 322 Md. 535, 549, 588 A.2d 793, 800, *cert. denied*, 502 U.S. 915, 112 S.Ct. 317, 116 L.Ed.2d 259 (1991); *Baltimore Luggage Co. v. Ligon*, 208 Md. 406, 414, 118 A.2d 665, 669 (1955).

## II. Administrative Damages

■ Appellants assert that the $54,000 damages figure, given in answer to question 5 on the original verdict sheet, was for "administrative damages" and was not supported in law or by the evidence. They draw this "administrative damages" label for the $54,000 from a written question submitted by the jury to the circuit court during the jury's initial deliberations:

"If we find there are 'monies due' from the defendant, and believe in addition there are interest and administrative damages, should we detail this on [Question] # 3, or list one lump sum."

After receiving this note, the court replied in writing: "[P]lease explain what you mean by 'administrative damages.'" It also submitted an additional written response, directing the jury: "If you find that there are moneys due please indicate the amount and the interest separately." The jury did not provide further explanation of what it meant by

---

9. Contrary to appellants' contention, the jury specified the amount of the verdict on both verdict sheets. *Contrast Gaither v. Wilmer*, 71 Md. 361, 364, 18 A. 590, 591 (1889) (granting new trial where jury, in handing down verdict for plaintiff, did not specify an amount).

"administrative damages"; instead, it assured the court that it "now underst[ood]."

We cannot speculate as to what the jury meant by "administrative damages." Further, the circuit court's response to the jury's question clearly directed them to focus their deliberations on "moneys due." We presume that the jury followed the court's instructions. *Owens–Illinois, Inc. v. Cook,* 148 Md.App. 457, 476, 813 A.2d 280, 290 (2002), *cert. granted on other issues,* 374 Md. 82, 821 A.2d 370 (2003).

■ Our focus, then, must be on whether the evidence supports an "actual damages" award, before interest, of $345,327 ($291,327 + $54,000) to RTS Thailand. Examining the evidence in the light most favorable to RTS Thailand, as the prevailing party, we conclude that the evidence described below is sufficient to support the verdict.

| | |
|---|---|
| $727,406.64 | (Value measured by net invoice price: sails consigned 1971–May 1998 per Plaintiff's Exhibit 35A) |
| + $ 41,589.00 | (Value measured by net invoice price: sails consigned June 1998–Oct.2001 per testimony of Mrs. Bacon) |
| $768,995.64 | (Total value of all consigned sales measured by net invoice price) |
| − $375,106.74 | (Paid on 1971–May 1998 account per Plaintiff's Exhibit 38A) |
| + $ 1,024.00 | (Miscredit: Museum of Yachting per testimony of Mr. Tasker) |
| + $ 11,273.20 | (Miscredit: non-negotiated check per testimony of Mr. Tasker) |
| − $ 1,682.00 | (Paid on June 1998–Oct.2001 account per Plaintiff's Exhibit 11A) |
| $404,504.10 | (Total value of unsold sails consigned, measured by net invoice price, before credits for returns) |
| − $ 72,269.75 | (Value of first shipment of returned goods, measured by net invoice price) |
| − $ 1,000.00 | (Value of second shipment of returned goods, measured by net invoice price) |
| $331,234.35 | (Total value of consigned sails, measured by net invoice price, less payments and other credits) |
| + $ 15,000.00 | (Adjustment—Hong Kong shipment; value of sails shipped in excess of net invoice price, per |

testimony of Mr. Tasker) [10]
$346,234.35 (Total value of sails consigned, less payments and
other credits).

■ Each appellee was found liable for conversion of the sails consigned to Bacon that were neither returned nor paid for.[11] The measure of damages in an action for conversion is the fair market value of the personalty at the time of the conversion, plus interest thereon to the date of the verdict. *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 415, 494 A.2d 200, 209 (1985). Here the evidence supported a value of the converted sales in excess of the jury's verdict, before interest, of $345,327. There was no reversible error in the total verdict.

## III. Limitations Instruction

With respect to the statute of limitations defense, the circuit court gave the following jury instruction:

"There is a three-year statute of limitations which is applicable to the Plaintiff's claims. That means that suit must be filed within three years of when the alleged wrong occurred. This suit was filed on June 29th of 2001.

"If a party is not likely to know, however, that he or she has been injured or damaged at the time the wrong occurred then the cause of action does not accrue until the party learns or as a reasonable person should have learned [of the] damage.

"If you find that the Plaintiff knew or should have known that any payment was due prior to June 29th, 1998, in other words that they had that knowledge prior to June 29th,

---

10. Mr. Tasker testified that the actual value of sails sent to Bacon for this 1973 shipment was $315,000, rather than $300,000 as invoiced.

11. Although question 6 on the original verdict sheet, dealing with Mrs. Bacon's liability, was phrased in the alternative ("fraud or conversion"), we interpret the "yes" answer to relate only to conversion. That interpretation reconciles the answer to question 6 with the answer to question 2 when the jury found that Mrs. Bacon's corporation, through which she acted, had not committed fraud.

1998, then the Plaintiff cannot recover as to those particular payments."

Appellants noted three exceptions to the charge, only two of which address the limitations instruction on which they base their arguments in this Court. Appellants told the trial court:

"The first [exception] is a failure to instruct the jury that on the discovery rule the burden of proof is clear and convincing.

"The second exception is the failure to instruct the jury that on a breach of contract claim the discovery rule that was part of the instructions does not apply and that it is three years from the breach of the contract."

In support of their first exception appellants rely on *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 241–43, 469 A.2d 867, 892–93, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). *Finch* involved two actions filed in the Eighth Judicial Circuit prior to the consolidation of the courts in that jurisdiction. The earlier case was an action in equity seeking rescission on the ground of fraud in the inducement of two contracts relating to patents. The later case was filed at law seeking damages for breach of the contracts. This Court adopted the reasons and conclusions set forth in a written opinion by the trial court. *Id.* at 199, 469 A.2d at 871. That court held that the plaintiffs' claims in equity were barred, as were all claims for breach of contract based on events that occurred more than three years prior to the filing of the suit at law. *Id.* at 241, 469 A.2d at 892.

The discussion in *Finch* to which appellants have referred us explains those holdings in terms of the discovery rule and the "statutory 'discovery rule,'" *id.*, presently found in Maryland Code (1974, 2002 Repl.Vol.), § 5–203 of the Courts and Judicial Proceedings Article (CJ). Nowhere in that discussion do we find any support for the proposition that a plaintiff who seeks to avoid a limitations defense by reliance on the discovery rule must prove, by clear and convincing

evidence, when the discovery took place.[12] We are not persuaded that the standard of proof for facts that would trigger the operation of the discovery rule is other than the ordinary preponderance of the evidence standard.

In their brief to this Court appellants expand their argument beyond their first exception by arguing a failure by the circuit court specifically to instruct that the burden was on RTS Thailand to persuade the jury that it did not, or should not, have discovered the alleged wrongs more than three years prior to the institution of this action.

In Maryland, in order properly to preserve an objection to a court's instructions to the jury, a party ordinarily must make a specific objection after the instructions are given. Md. Rule 2-520(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection"). The reasoning behind this rule is that "the trial court has no opportunity to correct or amplify the instructions for the benefit of the jury if the judge is not informed of the exact nature and grounds of the objection." *Fearnow v. Chesapeake & Potomac Tel. Co.*, 342 Md. 363, 378, 676 A.2d 65, 72 (1996). Because the appellants did not ask the trial court, in their exceptions, to instruct which party had the burden of persuasion on whether the discovery rule applied, we do not address appellants' expanded argument.

Appellants' second exception, a failure to charge that the discovery rule does not apply to breach of contract claims, rests on a legally incorrect premise. Appellants rely on *Bragunier Masonry Contractors, Inc. v. Catholic Univ. of Am.*, 368 Md. 608, 796 A.2d 744 (2002), which affirmed our

---

12. Nor is there any such statement with respect to an avoidance of limitations based upon CJ § 5–203. That section addresses a case in which "knowledge of a cause of action is kept from a party by the fraud of an adverse party[.]" Because the circuit court in the case now before us did not instruct on CJ § 5–203, we have no occasion to speak to the standard of proof under that statute.

decision in *Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.*, 139 Md.App. 277, 775 A.2d 458 (2001). The *Bragunier* litigation was an attachment action. The judgment creditor was a subcontractor, and the debtor was a general contractor. The creditor attached credits allegedly due from the garnishee to the debtor, representing monies that had not been paid by the garnishee to the debtor upon completion of a construction contract on which the garnishee was the owner. Completion had taken place more than three years prior to the attachment. Both appellate courts held that the attachment should have been quashed because the limitations defense available to the garnishee on a direct claim by the debtor was also available to the garnishee on the indirect claim of the creditor.

Significant here is that the Court of Appeals concluded that the debtor's cause of action for the unpaid contract price had accrued, for purposes of a strict application of the three year statute of limitations under CJ § 5–101 and for purposes of the discovery rule, when the garnishee failed to pay the balance of the price to the debtor upon completion of its construction contract with the garnishee.[13] The Court of Appeals said that "when the date of the breach and the discovery of the breach are the same, the discovery rule is satisfied." *Bragunier*, 368 Md. at 628, 796 A.2d at 755.

Appellants' argument rests entirely on the literal language of the following passage from this Court's opinion in *Bragunier*:

> "Ordinarily, in a breach of contract action, in the absence of fraud concealing the cause of action, for which there is a separate limitations provision, *see* § CJ 5–203, the cause of action accrues and hence limitations begins to run from the

---

13. As the Court of Appeals has explained, the discovery rule "is not so much an exception to the statute of limitations, as it is a recognition that the Legislature, in employing the word 'accrues' in [CJ] § 5–101 never intended to close our courts to plaintiffs inculpably unaware of their injuries." *Murphy v. Merzbacher*, 346 Md. 525, 532, 697 A.2d 861, 865 (1997). *See also Newell v. Richards*, 323 Md. 717, 723, 594 A.2d 1152, 1155 (1991), for a discussion of the discovery rule's evolution.

date of the breach and not from the date that the plaintiff discovers the defendant's breach. In other words, the discovery rule recognized by the Court of Appeals in *Poffenberger v. Risser*, [290 Md. 631, 431 A.2d 677 (1981)], while applicable to many causes of actions in tort, does not apply to actions for breach of contract.... The discovery rule was not applicable to the garnishment proceeding because it would not have had any application to the breach of contract action for non-payment that [the debtor] could have brought against the [garnishee]."

139 Md.App. at 298, 775 A.2d at 470.

The above-quoted rationale is inconsistent with the rationale applied by the Court of Appeals in its *Bragunier* and, thereby, effectively has been disapproved. In explaining why the time of accrual of the cause of action for the alleged credits was not postponed by the discovery rule, the Court of Appeals said:

"In the case *sub judice*, the discovery rule, *while applying to the relationship between [the garnishee] and [the debtor,]* makes no difference. If there was a breach of contract between them, [the debtor-general contractor] was at all times from the point of the completion of the contract for the [project] aware of, *i.e.,* had 'discovered,' the nonpayment, and thus had notice of any possible breach of contract."

368 Md. at 632, 796 A.2d at 758 (emphasis added). Obviously, if the discovery rule did not apply to breach of contract actions, it would have been unnecessary for the Court of Appeals to labor through an analysis reflecting that, in *Bragunier,* the time of strict accrual of the cause of action by breach and the time of accrual by discovery were the same. *See also Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 121 n. 3, 604 A.2d 47, 54 n. 3, *cert. denied,* 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992) (discovery rule "applicable to civil actions generally") (citing *Poffenberger,* 290 Md. at 637, 431 A.2d at 681).

In the instant matter, RTS Thailand was dependent upon Bacon to learn when a sale of a consigned sail had taken

place. If Bacon sold one of the consigned sails but did not advise the consigner, half way around the world, that a sale had taken place, and the net invoice price had not been remitted to the consignor, or deposited to the Alex Brown Account, RTS Thailand would not know of the breach of contract. This is not a case where, as a matter of law, breach and discovery of the breach were simultaneous.

Moreover, even if the discovery rule were inapplicable to breach of contract actions, it is applicable to conversion. That is the common ground of liability of the two appellants. See n. 11, *supra*.

### IV. Inter-Company Assignments

Appellants contend that all of the evidence relating to inter-company assignments of the accounts and choses in action against Bacon should have been excluded in accordance with appellants' continuing objection. The basis for the objection was that the first amended complaint, on which the case was tried, named only RTS Thailand as plaintiff. It failed to join the other Tasker entity consignors, and it failed specifically to allege earlier consignments to Bacon by RTS Hong Kong and RTS Australia, with ultimate assignment of those consignors' rights to RTS Thailand. Appellants do not contend that there was insufficient evidence at trial to support the jury's finding that appellants' obligation was owned, at that time, by RTS Thailand. Nor do appellants take the position that they were surprised at trial that the claims asserted against them by RTS Thailand included the value of sails originally consigned by RTS Hong Kong and RTS Australia. The argument rests either on non-joinder or on a point of pleading.

With respect to non-joinder, the common law rule has been changed by the Maryland Rules of Procedure. "At common law no action could be maintained in his own name by the assignee of a chose in action, such as a . . . personal obligation; and hence, in all cases of assignment of such choses in action, where an action upon them became necessary, the name of the assignor was required to be used as plaintiff." 1 J. Poe, *Pleading and Practice* § 323, at 270 (5th Tiffany ed. 1925)

(Poe). Chapter 51 of the Acts of 1829 permitted suits by assignees of choses in action where the assignment had been in writing. That statute, as amended, was in effect until June 1, 1957, when, as Maryland Code (1957), Article 8, § 1, it was repealed by Chapter 399 of the Acts of 1957. Chapter 399 repealed statutes that had become obsolete as a result of the Court of Appeals' adoption, effective January 1, 1957, of Rules of Practice and Procedure "embracing a series of rules ... wherein the prior rules of this Court and the procedural statutes of the State with respect to normal law and equity actions including appeals to this Court, have been codified[.]" Order of July 18, 1956, by the Court of Appeals adopting the Twelfth Report of the Standing Committee on Rules of Practice and Procedure. Those rules included then Rule 203.a requiring, with certain exceptions not here relevant, that "[a]n action ... be prosecuted in the name of the real party in interest[.]" That rule is today Maryland Rule 2–201.

This evolution in civil procedure is explained succinctly by leading commentators on the Federal Rules of Civil Procedure when discussing Fed.R.Civ.P. 17(a), which is comparable to Maryland Rule 2–201.

"At common law the assignee of a chose in action did not hold legal title to it and could not qualify as the real party in interest. Indeed, in large measure the real party in interest concept developed as a means of eliminating this restrictive rule. Under present law an assignment passes the title to the assignee so that he is the owner of any claim arising from the chose and should be treated as the real party in interest under Rule 17(a)."

6A C.A. Wright, A.R. Miller & M.K. Kane, *Federal Practice and Procedure: Civil 2d* § 1545, at 346 (1990) (footnotes omitted). In the instant matter, under the evidence accepted by the jury, RTS Thailand is the assignee of the accounts representing the consigned goods and holds the right to sue for their value.

With respect to appellants' pleading point, Poe points out that "[t]o entitle the assignee to bring the action in his

own name, he should set out in his declaration the assignment to himself[.]" Poe § 325, at 273. We shall assume, *arguendo,* that to comply with Maryland Rule 2–303(b)'s requirement that "[a] pleading . . . contain only such statements of fact as may be necessary to show the pleader's entitlement to relief[,]" RTS Thailand should have alleged the assignments as a matter of proper pleading. Nevertheless, it is clear that appellants were not unfairly prejudiced by the admission of evidence of the inter-corporate assignments even though those assignments were not alleged specifically in the first amended complaint.

That complaint made plain that RTS Thailand was claiming monies due over the entire three decade history of the relationship with appellants. Appellants recognized as much when, in their answer filed about one month before trial, they raised the following special defense, among others:

> "The claims set forth in Counts I through IV of Plaintiff's First Amended Complaint fail to set forth the appropriate legal capacity of Plaintiff to sue on behalf of any other entity, company, person, business or other corporation."

The documentary exhibits that obviously were assembled during the period of discovery also relate to the three decade course of doing business. Furthermore, although Mr. Tasker's deposition is not part of the record on appeal, appellee pointed out at trial, in opposition to appellants' continuing objection, that Mr. Tasker had been deposed concerning the inter-corporate assignments, and appellants did not challenge that representation to the court. Finally, appellants' fine point of pleading does not lack a degree of *chutzpah,* inasmuch as it was due to appellants' objection that the proposed second amended complaint was excluded. *See* n. 7, *supra.*

For all the foregoing reasons, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANTS.**